Virginia **HARRIS** and Jerry L. Reese, Administrator of the Estate of Ruth Reese, Deceased, Appellants,

v.

Ross W. **THOMPSON,** Jr. and William B. Sechrest, Appellees.

Court of Appeals of Kentucky.

June 29, 1973.

Charles V. Collins, Lexington, Richard M. Compton, Georgetown, for appellants.

V. A. Bradley, Jr., Bradley & Bradley, Virgil F. Pryor, McKnight & Pryor, Georgetown, Ross Thompson, Jr., pro se, for appellees.

PALMORE, Chief Justice.

Just before the break of dawn on February 16, 1968, an automobile being driven by the appellee William B. Sechrest, Jr., southward on U. S. Highway 25 from his home in Georgetown toward his place of employment in Lexington passed over a patch of ice on the road, went out of control, turned over and struck two ladies standing by a fence near the east or northbound side of the highway. One of the ladies, Mrs. Reese, was killed and the other, Mrs. Harris, was severely injured.

Mrs. Harris and the administrator of Mrs. Reese's estate brought suit against Sechrest and the appellee Ross W. Thompson, Jr., who was the owner of a house on the west side of the highway. The claims against Thompson proceeded on the theory that the ice on the road was formed of water that had escaped from a broken pipe in his house. A jury returned a unanimous verdict for Sechrest and a nine-man verdict for Thompson. The administrator and Mrs. Harris appeal from the ensuing judgment dismissing their complaints. They assert prejudicial error by the trial court in the following respects, which (except for point 7, which may not and need not

arise upon retrial of the case) we shall discuss in order:

1. In giving a contributory negligence instruction.

2. In giving an unavoidable accident instruction.

3. In allowing evidence of other accidents at the same place as the accident in question.

4. In denying appellants a directed verdict.

5. In denying a motion for new trial on the ground that the verdict was not supported by sufficient evidence and was contrary to law.

6. In failing to define agency in an instruction relating to the possible negligence of Thompson's brother in looking after the house in which the water pipe broke.

7. Misconduct of Sechrest's counsel.

Mrs. Harris and Mrs. Reese had left Georgetown at or shortly after 6:30 A.M. in a car driven by Mrs. Ella Moore. They were on their way to work in Lexington. At a point on U.S. Highway 25 about three miles south of Georgetown the road crosses a bridge known as Three-Mile Bridge and then slopes upward to the crest of a hill. The Thompson house and the intersection of a road called Coleman's Lane are situated on the west side of the highway between the bridge and the crest of the hill. U.S. 25 is a two-lane highway. According to a deputy sheriff, the ice patch was in the southbound lane of travel only, was "a little bit this way toward Georgetown" from the Thompson house, and ran to the center of Coleman's Lane. There was other testimony, given by Thompson, to the effect that on the west side of the road about half way between the bridge and the crest of the hill there were an old rock quarry and a wet-weather spring from which water sometimes drained onto the highway. When Mrs. Moore approached this area it was dark and her headlights were on. She said she was travelling at 40 to 45 m. p. h. but could have been going 50 m. p. h. The road was dry. She did not see the ice until she was "right on" it. Her car went out of control on the ice, spun around and came to rest facing back toward Georgetown. According to Mrs. Moore, her car stopped on the west side of the highway with two wheels off the pavement in a shallow ditch bordering the highway, but according to Mrs. Harris it came to rest on the opposite or northbound side of the highway.

All three of the ladies got out of the car to see what had happened to them. Mrs. Moore said the car had travelled some 200 feet to 300 feet beyond the point at which it went out of control, though Mrs. Harris testified it had slid only "20 to 25 feet." At any rate, Mrs. Moore got back in the car and drove it toward Georgetown in order to find a convenient turning place and then come back to pick up Mrs. Reese and Mrs. Harris.

Meanwhile, Mrs. Reese and Mrs. Harris walked down the side of the road toward Lexington for a distance of about 100 feet, "wanting to get away from the ice," and got over next to the fence. While they were in this position Sechrest's automobile approached from the north, hit the stretch of ice, went out of control, crossed the highway and struck Mrs. Reese and Mrs. Harris, and careened through the fence. According to the evidence for the plaintiffs, the place at which the two ladies were struck was about 320 feet from the southerly end of the ice slick. The deputy sheriff estimated that it was 160 feet from the ice to the crest of the hill and another 160 feet to the place at which the Sechrest automobile went through the fence. An engineer appearing for Sechrest testified that a person standing beside the fence at a point 336 feet south of Coleman's Lane and looking to the north could see approaching vehicles the entire distance from a point north of Three-Mile Bridge. Mrs. Harris did not, however, see the Sechrest

car approaching and had only a "vague recollection" of seeing it just before she was hit.

Sechrest testified that the accident happened about 6:45 A.M., that although dawn was beginning to break it was still dark and his lights were on, and that he was travelling at a speed of 45 to 50 miles per hour. He did not see the ice, did not know it was there, said he had never seen any ice or water there before, and did not slow down. He estimated that he was 5 or 6 feet north of Coleman's Lane when he realized he had hit something, after which he was unable to bring his car back under control. He did not see the two ladies before they were struck.

The speed limit was 50 m. p. h., although road signs were present indicating for southbound travelers that there was a curve and a side road. All of the witnesses agreed that this was a very hazardous stretch of highway even under normal conditions.

The appellee Thompson testified that he owned a house situated on a bank at the southwest corner of U.S. 25 and Coleman's Lane. It had been rented out for about three months to a man named Stone, who on February 1, 1968, had paid the rent for the month of February. Thompson had not been on the premises since some time in January. On the day of the accident he learned from his brother, Burnley Thompson, who lived a quarter of a mile up the road (U.S. 25), that Stone had moved out and that a water pipe in the house was broken. Neither Ross Thompson nor his brother Burnley had any previous knowledge or notice that the water pipe was broken. Burnley usually "watched over" his brother's property "just . . . to help him out," but had not been hired and was not under any contractual obligation to do so. Some "two or three days" before the accident he noticed that the window curtains had been taken down and heard from someone in town that the tenant had moved, but he made no investigation of the

premises and did not at that time communicate this information to Ross. The tenant had never complained about the condition of the house, and there was no evidence that any of its water pipes had been frozen or broken before.

There were several possible sources from which water could have flowed onto the highway near the mouth of Coleman's Lane, but the evidence was sufficient to support a finding that at least some of that which formed the ice patch on February 16, 1968, had come from the broken pipe in the Thompson house.

Other pertinent evidence will be mentioned as it becomes appropriate in connection with our analysis of the questions presented on the appeal, which follows:

### 1. *The contributory negligence instruction.*

According to the testimony of the engineer, the fence by which the two victims of this tragic accident were standing when struck by the Sechrest vehicle was less than 10 feet from the paved surface of the highway. Even though they may have been in a better position to anticipate the accident, having just experienced a similar though less serious misadventure, it is difficult to see any possible theory of negligence on their part except that during the brief interval in which they were awaiting Mrs. Moore's return they should have gone back toward Georgetown, placing themselves between the highway and oncoming traffic from the north, rather than toward Lexington. To demand such sagacity on the part of two ladies stranded in the dark on the side of the highway would, in our opinion, be too much. It is our conclusion that the instruction should not have been given.

It will be recalled that the jury returned a unanimous verdict for Sechrest and only a nine-man verdict for Thompson, which indicates, say the appellees, that the verdicts were not based upon contributory

negligence and that the error was not prejudicial.

■ It may be improbable that the verdicts were affected by the contributory negligence instruction, but assuredly it is not impossible, and we cannot speculate as to whether some of the jurors who voted with the majority did so on the basis of contributory negligence. Consequently, it is necessary that a new trial be granted.

2. *The unavoidable accident instruction.*

In Sloan v. Iverson, Ky., 385 S.W.2d 178, 179 (1964), we expressed "serious doubt whether an 'unavoidable accident' instruction should ever be given in an automobile collision case." Proof that an accident was unavoidable is neither more nor less than proof of non-negligence. It does not call for any modification or qualification of the duties applicable under the circumstances of the case.

The instruction here under attack reads as follows:

"If the jury believe from the evidence that the defendant, Sechrest, while operating his automobile in a careful and prudent manner within the meaning of these instructions, lost control of his automobile as a result of suddenly coming upon ice on the highway which he did not see and could not in the exercise of reasonable care have seen in sufficient time, and therefore lost control of his automobile so that he did not and could not with reasonable care have regained control of same in time to have avoided the accident then and in that event the law is for the defendant Sechrest and the jury should so find."

The propriety of this instruction must be determined in relation to the preceding instruction, which enumerated the specific duties embraced within Sechrest's general duty of ordinary care in the operation of his automobile.

■ One of these specific duties was "to have his automobile under reasonable control and not to operate it at a greater speed than was reasonable, considering the condition and use of the highway, insofar as the condition of the highway was known to him or should have been known to him in the exercise of reasonable care." This was appropriate to the circumstances of the case in conditioning Sechrest's duties upon what he should have known with respect to the existing condition of the highway. Cf. Tirey v. Tirey, Ky., 420 S.W.2d 564, 566 (1967).

■ The next following duty, which was to operate his automobile on the right-hand side of the highway "and not to pass over the center medium [sic] at the point where the accident herein occurred," was not modified so as to allow for an unanticipated emergency which, without fault on his part, may have prevented his so doing. As given in this instruction the duty was absolute, hence in the absence of some qualifying language appearing elsewhere in the instructions it would have amounted to a directed verdict against Sechrest, because obviously he did cross over the center line of the highway on the way toward striking the two pedestrians.

The separate instruction quoted above had the effect of providing the essential qualification of this specific duty imposed upon Sechrest. It told the jury in effect that if without negligence Sechrest was confronted with a sudden emergency which prevented his avoiding the accident by the exercise of reasonable care he was not liable. It is therefore our opinion that the instruction was not improper, though in the event of a new trial it is recommended that the sudden emergency principle be cast in the form of a qualification immediately following the enumeration of the specific duties of ordinary care and as part of the same instruction, along the following lines:

". . . all of the foregoing duties being subject however, to this qualification: that if immediately before the accident the defendant was suddenly and unexpectedly confronted with an emergency

by the presence of ice on the surface of the highway and such emergency was not brought about by any failure on his part to perform the duties above set forth, he was required thereafter to exercise only such care as an ordinarily prudent person would exercise under the same conditions and circumstances."

The appellants evidently feel that our opinions in Jones v. Carr, Ky., 382 S.W.2d 853 (1964), and Sloan v. Iverson, Ky., 385 S.W.2d 178, 179 (1964), and possibly Hettrick v. Willis, Ky., 439 S.W.2d 942, 944 (1969), have eroded the effect of Hall v. Ratliff, Ky., 312 S.W.2d 473 (1958), in which the defendant's vehicle had struck a patch of ice and slid off the road and this court held he was entitled to a sudden emergency instruction.

Perhaps a good deal of confusion on this subject has arisen from a failure to distinguish between the theories of sudden emergency and unavoidable accident, and also from a tendency to pay too much regard to the label instead of the basic theory.

■■ As we have indicated, that an accident was unavoidable merely negates the existence of negligence as a causative factor. As such, it does not require an instruction, and the giving of one has the possible prejudicial effect of placing undue emphasis on the defendant's evidence tending to explain *why* he was not negligent. But when a defendant is confronted with a condition he has had no reason to anticipate and has not brought on by his own fault, but which alters the duties he would otherwise have been bound to observe, then the effect of that circumstance upon these duties must be covered by the instructions. It is not a matter of defense which must be pleaded (though in fact it *was* pleaded in Hall v. Ratliff), but a matter of what his duties were under each state of facts inferable from the evidence, and it is of course the plaintiff's burden to persuade the jury as to which of those factual states existed.

■ To summarize this phase of the discussion, whether the instruction on a motorist's duties should be qualified by a proviso such as the sudden emergency theory does not depend upon whether the particular circumstance might be characterized in common parlance as a "sudden emergency," but whether it changes or modifies the duties that would have been incumbent upon him in the absence of that circumstance. In this case the qualification was made necessary because by not remaining on the right side of the road Sechrest violated a specific duty unless the exceptional circumstance of the ice on the road had the effect of relieving him from it. Had the accident taken place in his own lane of travel, or on the right side of the highway, it would not have been necessary, because then the unexpected presence of the ice would have amounted to no more than a condition bearing upon the question of whether the accident resulted from a failure on his part to comply with the more generalized duties of ordinary care. The proper criterion is whether any of the specific duties set forth in the instruction would be subject to exception by reason of the claimed emergency.

We do not accede to the appellants' argument that under the cases above cited the presence of ice on a highway cannot be the occasion for inclusion of the sudden emergency theory in the instructions.

### 3. The evidence of other accidents.

At 4:45 A.M., some two hours before the accident in question, the appellee Sechrest's witness Roy Pollett, driving southward at a speed of 40 m. p. h. with his headlights on, had encountered the ice in the vicinity of Coleman's Lane and lost control of his automobile, which went off the highway, turned around and struck a telephone pole. He did not see the ice before he was upon it. A few minutes after the Sechrest accident the witness Gail Tackett, also driving southward at the same place and at a speed of 40 m. p. h., had a similar experience,

and had not observed the ice before he skidded. Another witness, W. J. Jones, whose automobile was struck from the rear by the Tackett vehicle, gave testimony substantially to the same effect.

The appellants objected to all of this evidence of other accidents, claiming among other arguments that they were not shown to have occurred under similar circumstances (for example, speed) as the Sechrest accident.

■ Evidence of the occurrence or nonoccurrence of other accidents or injuries under substantially similar circumstances is admissible when relevant to certain limited issues, such as the existence or causative role of a dangerous condition, or a party's notice of such a condition. McCormick on Evidence (2d ed.) § 200; Wigmore on Evidence (3d ed.) § 458; 29 Am.Jur.2d, Evidence, §§ 305 et seq.; and Annotations at 31 ALR2d 190 and 70 ALR2d 167. Most usually, as indicated by the authorities collected in these texts, the case in which it is admitted involves a claim against the person or persons responsible for the condition alleged to have been the cause of the accident. In the instant proceeding it was of course unnecessary for these particular purposes, because there was no real issue as to whether the patch of ice on an otherwise dry highway constituted a dangerous condition or whether that condition was a causative factor in the accident, and there was no contention that any of the accidents were relevant to the issue of notice. Hence the only purpose that could have been served by this evidence was to show whether Sechrest was negligent by comparison with the experience of other persons under similar circumstances.

■ As we all recognize, in a negligence case the comparison to be made is between the party alleged to have been negligent and that imaginary ideal, the ordinarily prudent person acting under similar circumstances. Without any way to prove or to judge whether another person who did or did not have an accident at the same place and under the same circumstances was himself an ordinarily prudent person, or was above or below average in that respect, we are forced to the conclusion that such evidence cannot be competent on the narrow issue of negligence.[1] Cf. 29 Am.Jur.2d, Evidence, § 308.

Our opinions on the subject disclose a certain degree of ambivalence. The general rule stated in Louisville & N. R. Co. v. Loesch, 215 Ky. 452, 284 S.W. 1097, 1100, 47 A.L.R. 347 (1926), is "that evidence of a previous accident at the same place is incompetent upon the investigation of the cause of a subsequent one." Yet in Louisville & N. R. Co. v. Jackson's Adm'r, 250 Ky. 92, 61 S.W.2d 1104, 1105 (1933), and Phelps v. Henkels & McCoy, Inc., Ky., 435 S.W.2d 83, 86 (1968), "the absence of contributory negligence on the part of plaintiff's decedent" was cited as an issue on which such evidence may be admitted. In neither of those cases, however, was it necessary so to decide, because in each of them the evidence was admissible as tending to show both the dangerous tendencies of the condition and notice to the defendant who was alleged to be responsible for it, and to the extent that they stand for the proposition that the occurrence or nonoccurrence of other accidents may be shown for the sheer purpose of comparison with the conduct of a party alleged to have been negligent in a similar accident they are overruled.

Although we hold the evidence of other accidents inadmissible on the issue of Sechrest's negligence, vel non, its reception by the trial court was not only justified but made necessary by testimony introduced earlier, over objections of the appellees, by the appellants themselves.

For example, the witness Libby Abrams testified that shortly before the accident

---

1. Obviously the same argument can be made with respect to the issue of whether a particular condition was abnormally dangerous, but that question is not before us in this case.

she had driven over the same patch of ice but was able to see it in time to reduce her speed from 45 m. p. h. and pass over it without accident. The witness Luther Mason came along after the accident, did not notice the ice at all, topped the crest of the hill at 40 to 50 m. p. h. without having skidded, and then stopped upon seeing a lady he knew standing by the side of the road. The witness Frank Sargent drove past the scene of the accident at 7:30 or 8:00 A.M., in the daylight, at a speed of 40 to 50 m. p. h., saw the ice at a distance of 50 to 60 feet, continued across it without slackening speed, and had no trouble. Four other occupants (one of them being the husband of Mrs. Harris) of a car that drove by in the same direction within minutes after the accident were permitted to testify that they saw the ice from a distance of three or four car lengths and that the driver slowed down from 40 to 45 m. p. h. to 5 m. p. h., or "as much as possible," and passed on with no difficulty.

█ The admission, over Sechrest's objection, of this array of evidence to the effect that some people got by without accident entitled him to rebut it by evidence that other motorists were not so fortunate. Claycomb v. Howard, Ky., 493 S.W.2d 714, 717 (1973). In short, the appellants, having opened the book on the subject, were not in a position to complain when their adversaries sought to read other verses from the same chapter and page. We do not perceive any substantial dissimilarity in the circumstances.

### 4. *Denial of a directed verdict.*

█ This contention is based on the argument that as a matter of law Sechrest was negligent and Mrs. Reese and Mrs. Harris were not. As heretofore indicated, we conclude that there was no submissible issue of contributory negligence, but we cannot agree that Sechrest was negligent as a matter of law.

### 5. *Denial of the motion for a new trial.*

The argument on this point runs along the same lines as the contention that the appellants were entitled to a directed verdict.

█ With respect to Thompson, it is said that under the rule of Rylands v. Fletcher, LR 1 Exch. 265, LR 3 HL 330, 4 Hurlst & C 263, 1 Eng.Rul.Cas. 236, the owner of premises from which water escapes and damages another is liable as a matter of law. The same argument was made and found wanting in United Fuel Gas Co. v. Sawyers, Ky., 259 S.W.2d 466, 38 A.L.R.2d 1261 (1953). See Louisville Refining Company v. Mudd, Ky., 339 S.W.2d 181 (1960). Certainly by no stretch of the imagination could the maintenance of water pipes and a system of running water be considered an unreasonable use of property within the nuisance theory. Accidental damage resulting from an unanticipated malfunctioning of the system could be actionable only on the theory of negligence, and in such a case the test of liability is whether by the exercise of ordinary care the defendant should have foreseen and provided against the misadventure or should have discovered and remedied it. Cf. Stein v. Louisville Water Co., Ky., 249 S.W.2d 750, 752 (1952). There was no basis in this case for holding Thompson liable as a matter of law. A better question, which we do not reach, is whether the converse is true, and a verdict directed for Thompson.

█ Sechrest, the appellants submit, is liable as a matter of law under the doctrine of *res ipsa loquitur,* but there is no such magic in that doctrine, at least as it is conceived in this jurisdiction. See discussion in Bell & Koch v. Stanley, Ky., 375 S.W.2d 696 (1964). The effect in this case was the same as in Vernon v. Gentry, Ky., 334 S.W.2d 266, 268, 79 ALR 2d 1 (1960), except that the jury found the other way. That is, the facts were sufficient to entitle the plaintiffs to a directed ver-

dict in the absence of an explanation by the defendant tending to rebut the prima facie case of negligence arising from the evidence adduced by the plaintiffs, but Sechrest's explanatory evidence had the effect of reducing it to a permissible inference. The burden being on the plaintiffs to prove negligence, it was necessary for them to persuade the jury that the presence of ice on the highway did not exculpate him. Again, we reject the contention that as a matter of law an automobile cannot slide across a highway without negligence on the operator's part.

### 6. *The failure to define agency.*

An instruction was given to the effect that if the accumulation of ice on the highway resulted from the flow of water from the Thompson house, that Thompson knew or by the exercise of ordinary care could have known of the danger thus created, and that his failure to prevent or remedy it was a proximate cause of the accident, the jury should find against him. The same instruction went on to say that he was liable also for a similar negligent failure on his brother Burnley's part if the jury should believe from the evidence that Burnley was his agent for the purpose of inspecting the premises.

There was no objection to this instruction. However, after retiring to deliberate on the case the jury asked the trial court, in the presence of counsel, for a definition of agency as mentioned in the instruction. The court declined to give it. Again no objection was presented, nor was any question raised by counsel until the motion for new trial was made.

Without implying that there was enough evidence to submit the case against Thompson to the jury in the first place, we think the obvious answer on this point is that if the appellants were not satisfied with any phase or portion of the instructions the time to speak was before they were given to the jury. C.R. 51. We perceive no good to be accomplished by departing from the letter of the Rule.

In conclusion, it will be noted that it may very well have been unnecessary to reverse this judgment if it had been possible to tell whether the verdict was based to some extent upon contributory negligence. When instructions are given on both negligence and contributory negligence, this type of "blind spot" can be forestalled by using a form of instructions in which, following the enumeration of each party's duties, the jurors are required to answer the following interrogatory:

Do you believe from the evidence that _____ failed to comply with any one or more of these duties?

    YES       NO
     (Strike one)

If your answer is "Yes," do you further believe from the evidence that such failure was a substantial factor in causing the accident?

    YES       NO
     (Strike one)

See C.R. 49.01 and note, The Case for Interrogatories Accompanying a General Verdict, 52 Ky.L.J. 852 (1964).

The judgment is reversed and the cause remanded for a new trial.

PALMORE, C. J., and MILLIKEN, OSBORNE, REED, STEINFELD and STEPHENSON, JJ., sitting.

All concur.