RENDERED: AUGUST 26, 2010
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2007-SC-000795-DG
2008-SC-000204-DG

DATE 9-16-10

ELAINE T. HENSON AND ST. PAUL     APPELLANTS/CROSS-APPELLEES
FIRE AND MARINE INSURANCE COMPANY

               ON REVIEW FROM COURT OF APPEALS
V.                CASE NO. 2006-CA-001692-MR
           JEFFERSON CIRCUIT COURT NO. 03-CI-007021

DAVID KLEIN               APPELLEE/CROSS-APPELLANT

**OPINION OF THE COURT BY JUSTICE VENTERS**

**AFFIRMING**

This case arises from the collision of two personal watercrafts on Lake Cumberland, one operated by Appellant, Elaine Henson, and the other operated by Appellee, David Klein. A judgment based on a jury verdict was entered in the trial court in Klein's favor. The Court of Appeals affirmed the judgment. We granted discretionary review to consider Henson's argument that the jury was incorrectly instructed on the sudden emergency doctrine, and to re-examine our holding in *Regenstreif v. Phelps*, 142 S.W.3d 1 (Ky. 2004).[1]

---

[1] *Regenstreif* overruled *Bass v. Williams*, 839 S.W.2d 559 (Ky. App. 1992), and held that the sudden emergency doctrine is unaffected by the adoption of comparative fault.

We conclude that the sudden emergency jury instruction is essential to a proper determination of liability in emergency situations. Accordingly, we reaffirm *Regenstreif*, and affirm the decision of the Court of Appeals.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As a result of the collision, Henson sued Klein, alleging that his negligence caused her injuries. St. Paul Fire and Marine Insurance Company paid workers' compensation benefits to Henson, and intervened in the action to assert its right of subrogation against Klein. By agreement prior to trial, St. Paul allowed its interest in the matter to rise or fall with Henson's claim and did not participate in the trial. Although both Henson and St. Paul have appealed, for the reader's convenience, we refer throughout this opinion to both Appellants collectively as "Henson."

Evidence at trial established the following facts. Henson, director of business development for a construction company, assisted her employer in entertaining several business guests for a weekend on a houseboat on Lake Cumberland. Henson's friend, Klein, accompanied her to assist as needed. The houseboat was equipped with two personal watercrafts which were available for use by the hosts and their guests.

"Personal watercraft" is defined by KRS 235.010(4) as a vessel which uses an internal combustion engine to power a jet pump for its primary source of propulsion, and is operated by a person sitting, standing, or kneeling on the vessel, as opposed to a conventional boat, within which passengers and operators ride. Personal watercrafts are more commonly known by their brand

2

names, such as Jet Ski, WaveRunner, or Sea-Doo. The two involved here were Sea-Doos, and we will refer to them throughout this opinion by that name.

Like most boats, a Sea-Doo has no mechanical brake. Stopping is normally achieved by releasing the throttle to stop the forward propulsion. With no rudder, steering is achieved by turning a handlebar that changes the direction of the jet thrust. As a result, steering efficacy is significantly reduced when the throttle is released. Because they operate under different mechanical systems and in an entirely different environment, the driving characteristics of personal watercrafts are very different from automobiles, motorcycles, or other vehicles that operate on land.

During the weekend outing, Henson decided to take a ride on one of the Sea-Doos. Her employer asked Klein to follow her on the other Sea-Doo. He complied. After about an hour, they decided to return to the houseboat. Henson led the way, with Klein trailing behind her and off to the left, in what may be described as the "wingman formation." The testimony placed Klein thirty to forty-five feet behind Henson and ten to twenty feet to her left. Elmer Knable, one of the business guests on the houseboat, witnessed the impending collision between Henson and Klein.

Knable testified that as the two Sea-Doos drew near the houseboat, Henson looked back over her left shoulder and shouted something to Klein. As she did so, she suddenly turned her Sea-Doo sharply to the left and abruptly decelerated to a stop directly in Klein's path. Klein reacted by leaning his body to the left and steering toward the left in an apparent effort to avoid Henson,

3

but within seconds his Sea-Doo struck the forward left side of Henson's craft. The collision left Henson with serious injuries. Knable testified that if Henson had not abruptly turned to the left and stopped, Klein would not have hit her. No evidence was offered to suggest that Henson was confronted with an object or obstacle that she sought to avoid by stopping or turning to the left.

Henson brought suit against Klein in the Jefferson Circuit Court.[2] In due course, the case was tried before a jury. With respect to Klein's duties, the trial court instructed the jury as follows:

> It was the duty of [Klein] . . . to exercise ordinary care for the safety of other persons using the waterway, including [Henson], and this general duty included the following specific duties:
>
> (a) To operate his personal watercraft in a reasonable and prudent manner in accordance with the "Rules of the Road" so as not to endanger human life, human physical safety or property;[3]
>
> All of the above duties being subject, however, to this qualification: that if immediately before the accident [Klein] was suddenly and unexpectedly confronted with an emergency by [Henson] turning her personal watercraft into the path of [Klein's] approaching watercraft, and if such emergency was not brought about by any failure on his part to perform the duties above set forth, he was not thereafter required to adopt the best course possible in order to avoid the impending danger but was required to exercise only such care as the jury would expect an ordinarily prudent person to exercise under the same conditions and circumstances.
>
> If you are satisfied from the evidence that [Klein], failed to comply with one or more of his duties and that such failure on his part was a substantial factor in causing the accident, you will find [Klein] at fault.

---

[2] Klein resided in Jefferson County.

[3] This specific duty is imposed by KRS 235.285(4).

4

With respect to Henson, the trial gave this instruction:

> It was the duty of [Henson] . . . to exercise ordinary care for the safety of other persons using the waterway, including [Klein], and this general duty included the following specific duties:
>
> (a) To operate her personal watercraft in a reasonable and prudent manner in accordance with the "Rules of the Road" so as not to endanger human life, human physical safety or property;[4] and
>
> (b) Not to change the course of her personal watercraft without first determining that a course change could be made without risk of collision.[5]
>
> If you are satisfied from the evidence that [Henson] failed to comply with one or more of her duties, and that such failure was a substantial factor in causing the accident, you will find [Henson] at fault for the accident.

These instructions were followed by a proper apportionment of fault instruction. The interrogatory in the first verdict form asked the jury, "Did defendant, David Klein, fail to comply with one or more of the duties set forth in Instruction No. 1, and, if so was that failure a substantial factor in causing the collision?" The jury answered "no," and as instructed, completed no other verdict forms, and then returned its verdict to the courtroom. Judgment was entered accordingly.

Henson appealed and argued to the Court of Appeals that the trial court erred by instructing the jury that Klein's duties were subject to the sudden emergency doctrine and by failing to instruct the jury that Henson had the right-of-way over Klein. Klein filed a protective cross-appeal to preserve his

---

[4] This specific duty is imposed by KRS 235.285(4).

[5] This specific duty is imposed by 301 KAR 6:030; Section 6(f).

claim that the trial court erred by refusing to allow opinion testimony from an officer who had investigated the accident. The Court of Appeals affirmed the judgment on appeal without reaching the merits of the cross-appeal.

On discretionary review, Henson reiterates her arguments regarding the jury instructions. We invited the parties to submit additional oral and written arguments relating to the viability of the sudden emergency doctrine. Henson argues that because tort damages are now allocated in accordance with comparative fault principles, the sudden emergency doctrine and the jury instruction that implements it no longer serve a useful purpose and cause confusion for juries.

## II. THE SUDDEN EMERGENCY DOCTRINE RETAINS A VALID AND USEFUL PLACE IN KENTUCKY JURISPRUDENCE

### A. The Current Status of the Sudden Emergency Doctrine in Kentucky

In *Bass v. Williams*, 839 S.W.2d 559, 563 (Ky. App. 1992), the Court of Appeals concluded that the shift from contributory negligence to comparative negligence eliminated the need for a sudden emergency instruction. The *Bass* court reasoned that the sudden emergency doctrine "has a quality to it that diminishes the duties of the defendant-driver . . . and is in violation of the 'direct proportion to fault' concept in *Hilen*[6]," and further, that it violates the concept that "[a party] is liable for an amount equal to his degree of fault, no

---

6 *Hilen v. Hays*, 673 S.W.2d 713 (Ky. 1984)(adopting the principles of comparative negligence apportioning damages among the parties according to each party's share of fault and abolishing contributory negligence as a complete bar to recovery.)

more and no less." *Bass,* 839 S.W.2d at 563; *see also Stratton v. Parker,* 793 S.W.2d 817, 820 (Ky. 1990).

The demise of the sudden emergency doctrine in Kentucky was short-lived. Twelve years later, in *Regenstreif v. Phelps,* 142 S.W.3d 1 (Ky. 2004), this Court overruled *Bass. Regenstreif* rejected the notion that the sudden emergency doctrine was incompatible with comparative negligence, finding instead that it "necessarily complements" comparative negligence "in those particular cases where additional circumstances alter the way in which one's degree of fault should be determined." *Id.* at 6.

Despite *Regenstreif,* the question of the sudden emergency doctrine's viability lingered. Now, we reaffirm its place as a necessary component of the process by which juries must determine the fault of parties who, finding themselves suddenly and unexpectedly in a position of imminent peril, respond in a way that might otherwise breach a specific duty of due care.

### B. The Sudden Emergency Doctrine Defined

The sudden emergency doctrine is generally defined at 57A Am.Jur.2d, *Negligence* § 198 (2004):

> [W]hen an actor is faced with a sudden and unexpected circumstance which leaves little or no time for thought, deliberation, or consideration, or causes the actor to be reasonably so disturbed that the actor must make a speedy decision without weighing alternative courses of conduct, the actor is not negligent if the actions taken are reasonable and prudent in the emergency context, provided the actor has not created the emergency.

The Restatement (Second) of Torts § 296 (1965) describes it as follows:

7

(1) In determining whether conduct is negligent toward another, the fact that the actor is confronted with a sudden emergency which requires rapid decision is a factor in determining the reasonable character of his choice of action.

(2) The fact that the actor is not negligent after the emergency has arisen does not preclude his liability for his tortious conduct which has produced the emergency.

The rationale for the rule arises from the perception of human nature that "a prudent person, when brought face to face with an unexpected danger, may fail to use the best judgment, may omit some precaution that otherwise might have been taken, and may not choose the best available method of meeting the dangers of the situation." 57A Am.Jur.2d, *Negligence* § 200 (2004). "The principle embodied in [the sudden emergency] rule enjoys almost universal acceptance in the courts of the nation, founded as it is upon common sense and a proper recognition of prudent standards in human conduct." *Breaux v. Roy Young, Inc.*, 397 So. 2d 1384, 1388 (La. App. 1981).

An important aspect in understanding how to transfer the doctrine from its abstract theoretical definition to a real-world practical context is emphasized in the following articulation of the concept, from *Regenstreif*, 142 S.W.3d at 4, (quoting *Harris v. Thompson*, 497 S.W.2d 422, 428 (Ky. App. 1973)):

> [W]hen a defendant is confronted with a condition he has had no reason to anticipate and has not brought on by his own fault, *but which alters the duties he would otherwise have been bound to observe,* then the effect of that circumstance upon these duties must be covered by the instructions.

(emphasis added).

8

As explained below in Section C, without the specific sudden emergency instruction, the duties set out in standard comparative negligence instructions would be immutable. They would not permit the jury to base its finding of fault on whether it believed a party's conduct was a reasonable response to an emergency situation because the jury would not know that a qualifying emergency event "alters the duties" required of the affected party.

### C. The Development of Sudden Emergency Doctrine in Kentucky Jurisprudence

In *City of Louisville v. Maresz*, 835 S.W.2d 889, 892 (Ky. App. 1992), the Court of Appeals briefly recited the historic underpinning of the sudden emergency doctrine, including its introduction into American law by the United States Supreme Court in *Stokes v. Saltonstall*, 38 U.S. (1 Pet.) 181, 193, (1839) (citing as authority the English case of *Jones v. Boyce*, 1 Starkie's Rep. 393, 171 Eng. Rep. 540 (N.P. 1816)) and its introduction into Kentucky jurisprudence in *South Covington & Cincinnati Street Ry. Co. v. Ware*, 84 Ky. 267, 1 S.W. 493 (1886) (citing *Stokes*, and noting that "[t]his rule is sustained by both reason and precedent.")

> The rule of law is that when a person is placed in a position of peril by the negligence of another, and is compelled to choose instantly what to do to save himself, if he chooses as a person of ordinary prudence would have in such a position and is injured, he has a right to recover, notwithstanding the fact that, if he had made a different choice, he would not have been injured.

*Illinois Central R. Co. v. Wilkins*, 149 Ky. 35, 147 S.W. 759, 760 (1912).

Although the sudden emergency doctrine initially appeared in cases, such as *Illinois Central R.R. Co.*, absolving the plaintiff from the fatal effect of

9

contributory negligence, the rationale behind the rule applied with equal force to those defending themselves against charges of negligence. By the early twentieth century, a review of reported cases shows that the rule was more often invoked by defendants, often transportation companies, as evidenced by its application in *Kentucky Traction & Terminal Co. v. Roschi's Adm'r,* 186 Ky. 371, 216 S.W. 579 (1919) and *Consolidated Coach Corp. v. Hopkins' Adm'r,* 238 Ky. 136, 37 S.W.2d 1 (1931) ("[I]f the driver of the bus had turned to the right instead of turning to the left, he would have passed behind the Ford, and no one would have been injured, but, with only two-thirds of a second in which to act, the bus company is not responsible if he chose not the wisest course.")[7]

We are aware of no boating accident cases in Kentucky that involve the sudden emergency doctrine, but we note that the concept has long been accepted in maritime litigation. *See The Elizabeth Jones,* 112 U.S. 514, 526 (1884) (quoting *The Bywell Castle,* L. R. 4 Prob. Div. 219) ("where one ship has, by wrong maneuvers, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been maneuvered with perfect skill and presence of mind."). In *Sekerek v. Jutte,* 25 A. 994, 995 (Pa. 1893), the court noted:

> [T]he change in the movement of the [decedent's] boat which brought a portion of it in front of [appellants' steamboat] was sudden, unexpected, and disconcerting. The action of the

---

[7] Although the rationale for the doctrine is applicable to any field of human endeavor, it is interesting to note that its use in litigation has been almost entirely in the context of transportation cases, perhaps because that activity very frequently combines the risks of exposure to injury with a need to respond quickly to changing conditions.

appellants' servants must therefore be considered in the light of the situation which suddenly confronted them. They were in the presence of an emergency which imperiled the lives of the men in the boat, and . . . had but a moment of time in which to think and act.

The doctrine has also been recognized in modern recreational boating accidents. *See Reed v. Reed,* 153 N.W.2d 356 (Neb. 1967) (whether defendant's conduct in motorboat collision was excusable under sudden emergency doctrine was question for jury); *Del Vecchio v. Lund,* 293 N.W.2d 474 (S.D. 1980) (operator of motorboat that struck water skier held entitled to a sudden emergency instruction).

We turn next to an examination of the practical application of the doctrine before and after the shift to comparative negligence.

## D. The Purpose Of The Sudden Emergency Instruction Is To Explain To A Jury That In An Emergency, Specific Duties Are Subject To Change

In his analysis of the doctrine in *Harris,* Chief Justice Palmore wrote:

[W]hether the instruction on a motorist's duties should be qualified by a proviso such as the sudden emergency theory does not depend upon whether the particular circumstance might be characterized in common parlance as a 'sudden emergency,' *but whether it changes or modifies the duties that would have been incumbent upon him* in the absence of that circumstance.

497 S.W.2d at 428 (emphasis added.)

Henson, adopting the views expressed in *Bass* and the *Regenstreif* dissent, argues that a sudden emergency instruction is not needed under a comparative negligence system because "at the end of the [sudden emergency] analysis, the jury is back to the exact language of ordinary care." The following statement reveals the flaw of that view:

11

> It is our belief that the sudden emergency instruction so qualifies [Defendant's] duties to such an extent that they are lessened. Fault is determined by breach of duties and that is the sole factor upon which liability is fixed . . . . It is conclusively clear that such an instruction is not necessary because everything under the sudden emergency was already said in the instructions on general and specific duties of the driver.

*Bass*, 839 S.W.2d at 563.

Far from being a defect of the sudden emergency instruction, the "lessen[ing]" of the duties applicable to individuals confronted with a sudden emergency is exactly what the doctrine requires. It is the essence of the doctrine as it developed in American law over the past 170 years. The sudden emergency instruction tells the jury that, if it believes an emergency existed, the relevant *duties change*.

When the substantive law of the case admits to no specific duties, a sudden emergency instruction may be unnecessary. The general duty to exercise ordinary care for one's own safety and the safety of others is universally present and never changes, although the conduct that constitutes a violation of the general duty may depend on the circumstances. But in the modern world of litigation, most aspects of human conduct and interaction are governed by statutes and regulations that prescribe specific duties. A negligence claim resting exclusively on the general duty of ordinary care is rare indeed. When a statutory duty is supported by evidence, it must be incorporated into a jury instruction as a "specific duty." *Humana of Kentucky, Inc. v. McKee*, 834 S.W.2d 711, 722 (Ky. App. 1992) ("[T]he court obviously is required to instruct the jury regarding that [statutory] duty because the

12

violation of such a duty, standing alone, may be sufficient to support a claim of negligence.").

Moreover, when a statutory duty is applicable, the jury instructions should, after explaining the general duty, specify that it "includes" certain enumerated specific duties because the breach of a duty imposed by statute or ordinance is negligence per se if the harm which occurred incident to violation of the statute is that type of harm which the statute was intended to prevent. *See Wemyss v. Coleman,* 729 S.W.2d 174, 180 (Ky. 1987). Where one's ability to conform to a specific duty is arguably affected by the presence of a sudden and unexpected peril, the jury is not adequately or fairly informed of what the substantive law requires unless the specific duty is qualified with a sudden emergency instruction.

*Harris* illustrates the point. There, a motorist crossed the centerline of a highway in apparent violation of his specific duties to keep his vehicle under reasonable control and on the right side of the road. As a result, he struck and killed two pedestrians. *Harris* pinpoints the reason why the sudden emergency instruction is necessary:

> In this case the [sudden emergency instruction] was made necessary because by not remaining on the right side of the road [the motorist] violated a specific duty unless the exceptional circumstance of the ice on the road had the effect of relieving him from it. Had the accident taken place in his own lane of travel, or on the right side of the highway, it would not have been necessary, because then the unexpected presence of the ice would have amounted to no more than a condition bearing upon the question of whether the accident resulted from a failure on his part to comply with the more generalized duties of ordinary care. *The proper criterion is whether any of the specific duties set forth in the*

13

*instruction would be subject to exception by reason of the claimed emergency.*

*Harris,* 497 S.W.2d at 428 (emphasis added.)

The point bears repetition: had the accident occurred under circumstances that implicated only the generalized duty of ordinary care, no sudden emergency instruction was required. But, the specific duties implicated by the conduct in question would be subject to exception by reason of the claimed emergency. The presence of the emergency does not *excuse* the breach of a specific duty; under appropriate circumstances, it can *eliminate* the duty so that the conduct (crossing to the wrong side of the road) is not a breach at all. *Harris* accurately explained the consequences of failing to give the sudden emergency instruction when it is due:

> The next following duty, which was to operate his automobile on the right-hand side of the highway 'and not to pass over the center medium (sic) at the point where the accident herein occurred,' was not modified so as to allow for an unanticipated emergency which, without fault on his part, may have prevented his so doing. As given in this instruction the duty was absolute, hence in the absence of some qualifying language appearing elsewhere in the instructions it would have amounted to a directed verdict against [the motorist], because obviously he did cross over the center line of the highway on the way toward striking the two pedestrians.

*Id.* at 427.

Without the "qualifying language" provided by a sudden emergency instruction, the jury would have no choice but to find the motorist at fault based on the obvious breach of specific duties, despite the law's recognition that in an emergency, with little time for deliberation, the obligation to obey a

14

specific duty may yield. A simple ordinary care instruction under comparative negligence does not do that.

### E. The Advent Of Comparative Negligence Did Not Eliminate The Need To Instruct Juries On Sudden Emergency

Although the sudden emergency doctrine developed when contributory negligence denied damages to injured plaintiffs whose own breach of care contributed to their injuries, it is not in principle uniquely or exclusively applicable to contributory negligence. Moreover, nothing in the substance of the doctrine is incompatible with the more equitable principles of comparative negligence. Before the adoption of comparative negligence, juries routinely determined whether either party, or both parties, had breached general or specific duties of care. The sudden emergency qualification of those duties applies equally to both plaintiffs and defendants. *Brown v. Todd*, 425 S.W.2d 737, 739 (Ky. 1968) ("the [sudden emergency] instruction qualifies the duties imposed on any party charged with negligence. In this case one of defendant's defenses was that the plaintiff driver was contributorily negligent. If the latter had a right to defend the charge of contributory negligence on the ground of sudden emergency, he would be entitled to the instruction the same as if he had been a defendant charged with original negligence.").

Under both comparative negligence and contributory negligence principles, a judgment of liability is based on the answers to two questions. First, who was at fault? Second, upon what basis will the damages be allocated among those parties found to be at fault?

15

Under comparative negligence, the determination of who was at fault follows exactly the same path as it did under contributory negligence. The question of fault has always been answered by determining whether the party breached an applicable duty and whether the breach was a substantial factor in causing the injury claimed.

What comparative negligence changed was the way we allocate, or apportion, fault. Under contributory negligence, if the plaintiff was to any degree at fault for his injury, all the damage was allocated to him, and he could recover nothing from the defendant, regardless of the defendant's degree of culpability. Under comparative negligence, the finder of fact allocates to each party a percentage of the total fault, and hence a percentage of the damages, based upon that party's conduct and the relationship of that conduct to the injury. Because the sudden emergency doctrine relates only to the question of whether a duty was breached, and has no affect on the means by which damages are allocated, the shift to comparative negligence should not in any way alter our view about the necessity of a sudden emergency instruction. Whether we allocate damages under comparative negligence or contributory negligence, without a sudden emergency instruction, the jury has no way to know that one's obligation to conform to specific duties may be affected by the sudden presence of imminent peril. Eliminating the sudden emergency instruction effectively eliminates the sudden emergency doctrine. We decline to do so now, and thus we reaffirm the conclusions reached in *Regenstreif*.

## F. The Sudden Emergency Doctrine Should Not Be Modified To Apply Only When The Party Invoking It Is Entitled To A Directed Verdict

Citing *Brown v. Wilson,* 401 S.W.2d 77 (Ky. 1966), Henson correctly notes that an emergency will not pardon the breach of a specific duty when the party invoking the doctrine caused the emergency. She contends, however, that the sudden emergency instruction given by the trial court created a presumption that Klein was acting within his standard of care, essentially granting Klein a directed verdict. We do not agree. The jury instruction given by the trial court properly and clearly informed the jury that Klein's reaction to the sudden emergency could be considered only "if such emergency was not brought about by any failure on [Klein's] part to perform the duties above set forth." Whether Klein was negligent, and whether his own negligence was a factor in creating the emergency were issues of fact to be resolved by a well informed and properly instructed jury. *Pathways, Inc. v. Hammons,* 113 S.W.3d 85, 89 (Ky. 2003) ("Breach and injury, are questions of fact for the jury to decide."). The instruction given did not impede the jury's ability to perform its role as the arbiter of the facts.

Henson also argues that the sudden emergency instruction given by the trial court was too confusing and too difficult for a jury to follow. She suggests that, if we decline to abolish the doctrine, we should establish a bright line rule limiting the sudden emergency instruction to cases in which the party seeking its protection would, but for the emergency, be entitled to a directed verdict.

The bright line rule urged by Henson would result in an unjust and uneven application of the sudden emergency doctrine. Under Henson's bright

17

line rule, the instruction would be denied to those against whom there existed some evidence of negligence before the onset of the emergency even though they may ultimately be found faultless if their negligence did not contribute to the emergency and their response to the emergency was reasonable under the cirumstances. We see no indication that Kentucky trial courts and juries, in more than a century of experience with the sudden emergency doctrine, have experienced any difficulty in understanding or applying it. Therefore, we see no reason to modify the rule.

## III. THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON THE APPLICABLE DUTIES

Having reaffirmed the place of the sudden emergency doctrine in Kentucky jurisprudence, we now turn to Henson's more specific question: whether the doctrine was properly applied, given the evidence before the trial court. Henson argues that the sudden emergency instruction should not have been given in this matter because the circumstances present here amounted to no more than a sudden "occurrence," rather than a sudden emergency, and because Klein's negligence precipitated the emergency. Finally, Henson asserts that the trial court erred by failing to instruct the jury that as the lead vehicle she had the right-of-way. We conclude that the trial court properly instructed the jury.

Relying primarily on *Robinson v. Lansford*, 222 S.W.3d 242 (Ky. App. 2006) and adopting the terminology used therein, Henson contends that Klein was not confronted with a "sudden emergency" but instead faced only a "sudden occurrence." She defines "sudden occurrence" as "a reasonably

18

anticipated action," whereas a sudden emergency is an "unforeseeable and unexpected event." She argues that in the exercise of ordinary care, Klein should have anticipated that Henson would turn her Sea-Doo and yell to him, and thus the sudden emergency instruction was improper. We do not find that categorizing an event as either an "occurrence" or an "emergency" is a particularly helpful tool in determining when the sudden emergency doctrine applies. Those categories are not the basis upon which *Robinson* was decided.

*Robinson* arose from a chain reaction, rear-end automobile collision. Robinson, in the lead vehicle, struck a vehicle in the road ahead of her and thus came to an abrupt stop. Lansford, following immediately behind Robinson, failed to stop and crashed into her. Lansford claimed Robinson's sudden stop confronted him with a sudden emergency. The Court of Appeals, citing *Harris,* correctly concluded that the sudden emergency instruction should not have been given, stating "[t]he doctrine should be applied [only] if it changes or modifies a duty that would have been incumbent upon a plaintiff or defendant in the absence of the emergency." *Robinson,* 222 S.W.3d at 245.

Lansford could not claim his response to Robinson's abrupt stop must be viewed in light of how the emergency may have altered his specific duties because there was no evidence that he responded or took any action at all as a result of the emergency. He simply continued ahead until he crashed. His lack of any action in response to the perceived emergency precludes him from a sudden emergency instruction because no duty, "incumbent upon a plaintiff or defendant in the absence of the emergency" could have been affected. *Id.* For

19

that reason, *Robinson* referred to the matter as a "sudden occurrence" rather than a "sudden emergency."[8]

Here, the evidence sufficiently supported Klein's claim that when Henson suddenly changed course and turned in front of him, he responded by trying to retain control of his vessel while veering to the left away from her. He had other options. He could have released the throttle and tried to stop. He could have veered to the right. The sudden emergency instruction was properly given to inform the jury how Klein's duty to operate his Sea-Doo in accordance with the "Rules of the Road" may have been affected by the facts as the jury found them.

Henson argues that the trial court and the Court of Appeals misconstrued the nature of the specific duties applicable to each of the parties. She asserts that by giving the sudden emergency instruction, the trial court adopted the theory that boats in the water should travel in "lanes" analogous to automobiles on a highway. This argument highlights the essential difference in the way the two parties view the accident. Henson sees the case as analogous to *Robinson* and *Maresz;* a rear-end collision that happened because two vehicles were travelling in the same lane, and the first one suddenly stopped, allowing the second vehicle to crash into it. Klein views the case, not as a rear-

---

[8] The same reason was applied by the Court of Appeals in *Maresz*, 835 S.W.2d at 893, stating, "However, there is no evidence whatsoever that appellee Maresz, when presented with this sudden occurrence, chose a course of conduct which appeared at the time to have been the safest course, which now appears not to have been the best or wisest choice . . . ."

end collision case, but as a case in which Henson changed her path of travel in such a way that she entered Klein's intended path.

"Each party to an action is entitled to an instruction upon his theory of the case if there is evidence to sustain it." *Reece v. Dixie Warehouse and Cartage Co.*, 188 S.W.3d 440, 449 (Ky. App. 2006) (quoting *Farrington Motors v. Fidelity & Cas. Co. of N.Y.*, 303 S.W.2d 319, 321 (Ky. 1957)). The problem with Henson's argument is that no evidence supports it. The evidence shows without contradiction that her Sea-Doo was not struck from behind because of a sudden stop. It was struck on the left side when she suddenly and sharply turned away from her line of travel. In more nautical terms, she changed her course, and entered Klein's anticipated line of travel.

Whether the two Sea-Doos, travelling together in a wingman formation, are considered to be travelling within a single lane or traveling in separate parallel lanes is immaterial to our resolution of the matter. Henson did not ask for an instruction that reflected either view. Her complaint is the sudden emergency instruction tacitly established a "lane theory" with attendant duties not recognized by the law. We neither endorse nor condemn what Henson refers to as a "lane theory." The evidence simply did not support her theory that this was a rear-end collision.

Henson further contends that the trial court improperly declined to instruct the jury on a second theory of the case — that Klein failed to yield the right-of-way to Henson. 301 KAR 6:030; § 6(b)(2) provides, among other things, that the operator of a vessel (including personal watercraft) overtaking

another vessel "shall yield the right of way to the vessel being overtaken." We agree with the trial court and the Court of Appeals that the evidence does not support such an instruction. There was no evidence that Klein was overtaking Henson or that the collision occurred because he failed to yield the right-of-way. Therefore an instruction reflecting that theory of the case was not proper.

We conclude that the trial court correctly instructed the jury on the duties applicable to each party, and properly qualified Klein's specific duty with the sudden emergency instruction.

### IV. KRS 235.285(4): "THE RULES OF THE ROAD"

As noted previously, the jury was instructed on the general duty of ordinary care and the specific duty imposed by KRS 235.285(4) to operate a motorboat or personal watercraft on public waters "according to the 'Rules of the Road' and in a reasonable and prudent manner so as not to endanger human life, human physical safety, or property." No objection was made to this instruction. In doing so, the trial court complied with its obligation to instruct in accordance with the applicable duties, as described in *Wemyss*, 729 S.W.2d at 180:

> The "general duty," breach of which gives rise to liability, is the duty to exercise ordinary care, and properly drafted instructions utilize "specific duties" as imposed by statutes only as amplification of the "general duty," and not as the source of such duty. Where there is a statutory duty, the usual instruction, after explaining the general duty, will then specify that such general duty "includes" certain enumerated specific duties. See illustrative instructions in Palmore, *Kentucky Instructions to Juries*, Vol. 2, Chapter 16, Automobiles.

22

However, we cannot allow the uncertainty in the specific duty created by KRS 235.285(4) to pass without comment. Nothing in the statute explains what compliance with those "Rules" requires or what the legislature meant by "the Rules of the Road." The statute is vague in that regard. It was suggested at the trial and presented as evidence that "Rules of the Road" referred to duties imposed by law on motorists, and meant that boat operators in traffic with other boats should, in analogous situations, observe the same rules that govern automobile traffic. That is not a useful analogy, considering that boats and automobiles have very different operating characteristics and mechanical systems, and they operate in very different environments. Applying rules made for vehicles travelling on well-defined roads to boats on a large lake or river is difficult and uncertain. We think it is more likely that the phrase, "Rules of the Road," was intended as a reference to the Inland Navigation Rules, 33 U.S.C.A. § 2001, *et. seq.*, which govern traffic on the inland waterways of the United States, and which are commonly referred to as "The Rules of the Road." *See Matheny v. Tennessee Valley Authority*, 557 F.3d 311, 317 (6th Cir. 2009) ("These Inland Rules of Navigation supply the 'Rules of the Road' governing navigation on inland waters."); *Turecamo Maritime, Inc. v. Weeks Dredge No. 516*, 872 F.Supp. 1215, 1229 (S.D.N.Y. 1994) ("The Inland Navigation Rules encompass long-standing steering and sailing rules and principles, otherwise known as 'Rules of the Road', which govern navigation on inland waters.").

23

We highlight this ambiguity in the statute with the respectful suggestion that the General Assembly provide clarification to better inform the boating public and the courts of the specific duties the legislature intended to impose.

## V. KLEIN'S CROSS-APPEAL

Klein filed a cross-appeal in this matter to preserve his argument that the trial court improperly limited the testimony of one of his witnesses, an officer who investigated the accident. However, due to the disposition of this case in his favor, we decline to review the merits of that argument.

## VI. CONCLUSION

For the reasons set forth above, we affirm the opinion of the Court of Appeals affirming the judgment of the Jefferson Circuit Court in this matter.

All sitting. All concur.

COUNSEL FOR APPELLANTS/CROSS-APPELLEES:

Brian Edward Clare
600 West Main Street, Suite 300
Louisville, Kentucky 40202

Judson Fuller Devlin
Fulton & Devlin
Browenton Place, Suite 165
2000 Warrington Way
Louisville, Kentucky 40222


COUNSEL FOR APPELLEE/CROSS-APPELLANT:

Catherine Marie Cundiff Sewell
Peter J. Sewell
Derek Patrick O'Bryan
Sewell, O'Brien & Neal, PLLC
One Riverfront Plaza, Suite 1800
401 West Main Street
Louisville, Kentucky 40202