Lillian D. BENNETT and Frank A. Bennett, Appellants,

v.

Harold B. GRAVES, M.D., Appellee.

Court of Appeals of Kentucky.

Oct. 14, 1977.

Rehearing Denied Nov. 18, 1977.

Norman R. Lemme, Pike, Lemme & Conway, Shepherdsville, for appellants.

James G. Apple, Stites, McElwain & Fowler, Louisville, for appellee.

Before MARTIN, C. J., and COOPER and HOWARD, JJ.

HOWARD, Judge.

This is an appeal from the Jefferson Circuit Court wherein summary judgment was granted for defendant-appellee, Harold B. Graves, M.D.

Plaintiff-appellant, Lillian D. Bennett (hereinafter referred to as Mrs. Bennett), was pregnant with her eighth child when she first saw defendant-appellee, Harold B. Graves, M.D. (hereinafter referred to as Dr. Graves), in connection with this pregnancy. Mrs. Bennett expressed her great desire not to have any more children and she and Dr. Graves discussed sterilization procedures. Dr. Graves advised against a hysterectomy immediately after the delivery of a child because of the enlargement of the uterus and blood vessels and the danger of hemorrhage and infection. He advised that Mrs. Bennett have a tubal ligation, a simple sterilization procedure.

Dr. Graves performed a tubal ligation on Mrs. Bennett immediately after delivery of her eighth child, on November 5, 1971. Dr. Graves used the Pomeroy method whereby a loop is made in each of the Fallopian tubes, tied off, and each loop is then cut. The statistical rate of failure with this type of surgery is about one percent (according to Dr. Graves) or one in every 1200 to 1500

cases (according to Dr. James Childers). Mrs. Bennett however did become pregnant.

After the birth of her ninth child on September 14, 1972, Mrs. Bennett arranged for a hysterectomy to be performed by Dr. James Childers. Dr. Childers first examined Mrs. Bennett on October 30, 1972 and advised her that she would have to wait several months before a hysterectomy could be performed. Because of the failure of the tubal ligation, Dr. Childers recommended a vaginal hysterectomy to be preceded by a "hysterosolpingogram" which is a test to determine the reason for the tubal ligation failure. This test involves the injection of radiopaque dye into the uterus under pressure to see if it can be forced through the Fallopian tubes. Dr. Childers stated that the test revealed that both tubes were blocked because the dye could not be forced into the tubes. When Dr. Childers performed the hysterectomy on Mrs. Bennett, he was able to visualize both ends of her tubes and the areas where Dr. Graves had performed the tubal ligation. The ends of the tubes were both blunted and closed. From everything Dr. Childers was able to observe, Dr. Graves had performed the tubal ligation according to accepted standards and techniques. Dr. Childers testified that he had seen pregnancies occur after a tubal ligation in his own practice.

Mrs. Bennett raises on appeal the issue of "informed consent" and that Dr. Graves breached this duty to inform her that the operation might not prevent further pregnancy which resulted in injury to her (i. e., the resulting pregnancy, delivery of the child, the child itself, and all the attendant costs until the child reaches the age of majority). There is some testimony that Mrs. Bennett's ninth child may have some physical disabilities and may be retarded, as two of her other children are.

Mrs. Bennett alleges that she was not informed that the tubal ligation was not absolutely foolproof in preventing pregnan-

cy. Dr. Graves, on the other hand, testified that he had talked about the possibility of failure with a tubal ligation. Mrs. Bennett, before the tubal ligation was performed, signed a consent to surgery form, as did her husband. That consent form contained the following statements:

The risks involved and the possibility of complications have been explained to me. Even though good results are expected I acknowledge that no guarantee or assurance has been given to me as to the results that may be obtained.

In *Holton v. Pfingst*, Ky., 534 S.W.2d 786, at page 789, the court discussed the concept of informed consent and draws this conclusion:

. . . It is our view that the cases considering the extent of required disclosure have failed in many instances to relate the requirement to the overall policy consideration. If it is the law, and it surely is, that a physician ordinarily is not liable for an honest mistake in judgment, when he follows acceptable medical standards for examination and diagnosis and treatment, then the extent of disclosure relevant to securing the patient's consent must· be evaluated in terms of what the physician knew or should have known at the time he recommended the treatment to the patient.

The court in *Holton* held that a verdict was properly directed for the defendant-ophthalmologist and he was not liable to a patient for the loss of the sight of one eye which resulted from a properly performed but unsuccessful surgical procedure.

Mrs. Bennett argues that Dr. Graves knew of her eight children and knew that a hysterectomy was better suited for sterilization. However, this argument works both ways. Mrs. Bennett knew she had eight children and knew that a hysterectomy could not be performed until some time after the delivery of a child. It is inconceivable to this court that a woman who knew of her propensity to become pregnant

would not have discussed with her doctor the chances of success or failure of the tubal ligation procedure. Mrs. Bennett's eighth child was born November 5, 1971, and her ninth child was born September 14, 1972.

As stated in *Holton,* the ophthalmologist's conduct was such that, giving the patient's evidence all favorable inferences, the ophthalmologist "was guilty, if anything, of only an honest mistake in judgment." Mrs. Bennett, quite understandably, did not desire to have any more children. Dr. Graves performed an operation with a very low failure rate, which he thought was best for Mrs. Bennett's health following delivery of her eighth child, and which he thought would be effective.

There being no genuine issue as to any material fact, summary judgment was properly granted to Dr. Graves. CR 56.01.

The judgment of the trial court is affirmed.

All concur.