Loretta SARGENT, Appellant

v.

William SHAFFER, M.D., Appellee

2013–SC–000111–DG

Supreme Court of Kentucky.

RENDERED: AUGUST 20, 2015

CORRECTED: AUGUST 26, 2015

Counsel for Appellant: Joe C. Savage, Joe C. Savage Law Firm.

Counsel for Appellee: Bradley A. Case, Stephen Joseph Mattingly, Dinsmore & Shohl, LLP.

OPINION OF THE COURT BY
JUSTICE VENTERS

On discretionary review, Appellant Loretta Sargent argues that the Court of Appeals erred in affirming a judgment of the Fayette Circuit Court absolving Appellee William Shaffer, M.D., from liability on Sargent's claim that he failed to obtain her

informed consent before operating on her. The trial judgment was based upon a jury verdict resulting from jury instructions which Sargent contends improperly stated Dr. Shaffer's duties under KRS 304.40–320, Kentucky's informed consent statute. For the reasons that follow, we reverse the judgment of the Court of Appeals and remand the case to the trial court for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

With a history of back problems that included two prior surgeries and a problem known as "foot drop," Sargent sought further treatment for her back and leg pain at Bluegrass Orthopedics. An MRI examination revealed a disc herniation, multilevel stenosis,[1] and disc degeneration at the lower levels of her spine. Consequently, Sargent was referred to Dr. Shaffer, an orthopedic surgeon at the University of Kentucky.

After more conservative modes of treatment failed to provide adequate relief, Dr. Shaffer agreed to perform what he described in his trial testimony as a difficult and risky lumbar laminectomy and decompression procedure involving the removal of bone and scar tissue from Sargent's lumbar spine. Shortly after surgery, Sargent began to experience weakness in her lower extremities; eventually, and as a consequence of the surgery, she suffered incontinence and permanent paralysis from her waist down.

Sargent filed suit in the Fayette Circuit Court alleging that Dr. Shaffer was negligent in his care and treatment of her

medical problems. In pre-trial discovery and at trial, Sargent's evidence focused on establishing that Dr. Shaffer was negligent in his performance of the surgical procedure *and* negligent in his failure to adequately inform her of the possible risks associated with the surgery. Both sides presented expert testimony on both theories of negligence. After overruling defense motions for directed verdicts, the trial court gave a separate jury instruction on each theory of liability. The jury returned verdicts for Dr. Shaffer on both theories. The trial court entered judgment accordingly and the Court of Appeals affirmed the judgment. On discretionary review, the sole issue that Sargent presents is her claim that the judgment should be set aside because the trial court's jury instructions misstated the law regarding informed consent.

## II. STANDARDS OF REVIEW FOR ALLEGATIONS OF INSTRUCTIONAL ERROR

Before we undertake our analysis of the issue presented here, we pause to address the unresolved inconsistency we noted in *Goncalves v. Commonwealth,* 404 S.W.3d 180, 193 (Ky. 2013). As we said in *Goncalves,* recent opinions of this Court appear to be inconsistent on whether allegations of instructional error are to be reviewed by appellate courts *de novo* or for abuse of discretion.[2] In resolving this ambiguity, we distinguish between two types of alleged errors involving jury instructions.

1. Spinal stenosis is the narrowing of spaces in the spine which causes pressure on the spinal cord and nerves.

2. As noted in *Goncalves,* 404 S.W.3d at 193 n. 6, in *Skaggs v. Commonwealth,* 2009 WL 1830807 (Ky. June 25, 2009), we declared

that alleged errors injury instructions will be reviewed in appellate courts *de novo;* but in *Ratliff v. Commonwealth,* 194 S.W.3d 258 (Ky. 2006), we suggested that such issues must be resolved by applying the abuse of discretion standard of review.

The first type of instructional error is demonstrated by the claim that a trial court either (1) failed to give an instruction required by the evidence, or (2) gave an instruction that was not sufficiently supported by the evidence. For example, often in criminal trials a trial judge must decide whether to instruct the jury on a lesser included offense, or whether to instruct upon a specific defense such as self-protection. The second type of instructional error is represented by the claim that a particular instruction given by the trial court, although supported by the evidence, was incorrectly stated so as to misrepresent the applicable law to the jury.

 The trial court must instruct the jury upon every theory reasonably supported by the evidence. "Each party to an action is entitled to an instruction upon his theory of the case if there is evidence to sustain it." *McAlpin v. Davis Const., Inc.,* 332 S.W.3d 741, 744 (Ky. App. 2011) (quoting *Farrington Motors, Inc. v. Fidelity & Cas. Co. of N.Y.,* 303 S.W.2d 319, 321 (Ky. 1957)). The same rule applies in criminal cases. *Thomas v. Commonwealth,* 170 S.W.3d 343, 348–49 (Ky. 2005).[3] So, with respect to the first type of instructional error, in deciding whether to give a requested instruction the trial court must decide "whether the evidence would permit a reasonable juror to make the finding the instruction authorizes." [4]

 The lingering issue is whether an appellate court reviewing that decision should decide the matter *de novo,* based upon its own perception of the legal theories that may be deduced from the evidence and accepted by a reasonable juror, or whether the reviewing court should apply the abuse of discretion standard, thus giving a measure of deference to the trial judge's perspective of how the evidentiary facts relate to the tendered instructions. Having considered the matter in the context of this case, we now clarify our prior rulings with the hope of ending any lingering confusion. When the question is whether a trial court erred by: (1) giving an instruction that was not supported by the evidence; or (2) not giving an instruction that was required by the evidence; the appropriate standard for appellate review is whether the trial court abused its discretion.

 Under the familiar standard prescribed in *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999), a trial court abuses its discretion when its decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles. A decision to give or to decline to give a particular jury instruction inherently requires complete familiarity with the factual and evidentiary subtleties of the case that are best understood by the judge overseeing the trial from the bench in the courtroom. Because such decisions are necessarily based upon the evidence presented at the trial, the trial judge's superior view of that evidence warrants a measure of deference from appellate courts that is reflected in the abuse of discretion standard.[5]

3. In the criminal context, *Thomas v. Commonwealth,* 170 S.W.3d 343, 348–49 (Ky. 2005) holds that "[I]t is the duty of the trial court in a criminal case to instruct the jury on the whole law of the case, RCr 9.54(1), and this rule requires instructions applicable to every state of the case deducible from or supported to any extent by the testimony."

4. *See Springfield v. Commonwealth,* 410 S.W.3d 589, 594 (Ky. 2013) ("Therefore, in evaluating the refusal to give an instruction we must ask ourselves, construing the evidence favorably to the proponent of the instruction, whether the evidence would permit a reasonable juror to make the finding the instruction authorizes.")

5. There is, of course, an anomaly in distin-

However, when it comes to the second type of instructional error—whether the text of the instruction accurately presented the applicable legal theory—a different calculus applies. Once the trial judge is satisfied that it is proper to give a particular instruction, it is reasonable to expect that the instruction will be given properly. *Martin v. Commonwealth*, 409 S.W.3d 340, 346 (Ky. 2013). The trial court may enjoy some discretionary leeway in deciding what instructions are authorized by the evidence, but the trial court has no discretion to give an instruction that misrepresents the applicable law. The content of a jury instruction is an issue of law that must remain subject to *de novo* review by the appellate courts.

In summary, a trial court's decision on whether to instruct on a specific claim will be reviewed for abuse of discretion; the substantive content of the jury instructions will be reviewed *de novo*. This distinction is also reflected in the opinions of the Sixth Circuit Court of Appeals. For example, *see Fisher v. Ford Motor Co.*, 224 F.3d 570, 576 (6th Cir. 2000) ("Because the correctness of jury instructions is a question of law, we review de novo a district court's jury instructions. A district court's refusal to give a specific requested jury instruction, however, is reviewed for abuse of discretion.") (citations and internal quotations omitted).[6]

With this differentiation between the applicable standards of review for instructional error in mind, we now redirect our attention to the specific instructional error alleged in the case at bar. The trial court agreed that the evidence supported an instruction on the theory that Dr. Shaffer was negligent in his duty to obtain Sargent's informed consent for the surgery, and there is before us no claim that the trial judge abused her discretion in that decision. The issue, rather, is strictly whether the informed consent instruction given by the trial court correctly incorporated the applicable law so as to guide the jury accurately in its determination. Our review is, therefore, *de novo*; and, upon application of that standard, we conclude that the instruction given in this case was *not* correct.

## III. THE INFORMED CONSENT INSTRUCTION

Sargent claimed that prior to the surgery she was not informed by Dr. Shaffer or anyone else that paralysis or the loss of her bladder and bowel functions were possible risks associated with the surgery. Dr. Shaffer testified that after

---

guishing these standards of review and it flows directly from the familiar definition of "abuse of discretion" provided in *English* and recited in countless opinions. While the trial courts are generally positioned to have the better view of the facts of the case, they do not have a better view of the applicable law. When it is argued that a trial court abused its discretion because its decision was "unsupported by sound legal principles," we must examine the application of those legal principles, and that is inherently a matter of law. We generally accord no deference to a trial court's view of the law. Thus, as a practical matter, in that limited instance there is no difference between review for abuse of discretion and *de novo* review.

6. *See also Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1154 (10th Cir. 2012) ("We review a district court's decision to give a particular jury instruction for abuse of discretion," but "we review de novo legal objections to the jury instructions.") (citations omitted); *Galdamez v. Potter*, 415 F.3d 1015, 1021 (9th Cir. 2005) ("The district court's formulation of jury instructions is reviewed for abuse of discretion, as is the sufficiency of the evidence to support a mixed motive instruction ... [w]hether an instruction misstates the law, however, is a legal issue reviewed de novo." (citations omitted)).

more conservative treatment options had been exhausted without success, he tried to dissuade Sargent from the surgical option because it was very risky and offered no assurance that her condition would be improved. The words he used to inform her of the risks of surgery were, by Dr. Shaffer's own admission, limited to "infection, bleeding, nerve damage, dural leak, injury to the nerve, and destabilization of the scoliosis requiring fusion." The written consent form signed by Sargent prior to surgery listed those same items, and further included the following: "injury to the surrounding structures" and "anesthesia."

Dr. Shaffer concedes that when he explained the surgical risks to Sargent he never used the terms "paralysis," "incontinence," "loss of bowel and bladder control," or any variations thereof. His position, expressed by one of his trial experts, was that because "the word [sic] 'nerve damage' encompasses ... the entire spectrum of things from the slightest numbness to devastating injury," it satisfied the medical standard of care for reasonably informing a patient of the possibility of paralysis and loss of bowel and bladder control. In contrast, Sargent presented expert testimony that Dr. Shaffer's explanation of the risks provided to her did not satisfy the standard for accepted medical practice; that is, that "injury to the nerve" and "nerve injury" were not medically acceptable ways to inform a patient of the risk of being paralyzed from the waist down.

The trial court agreed that Sargent had presented sufficient evidence to warrant an instruction on the issue of lack of informed consent. Although Sargent tendered jury instructions that paralleled the language of KRS 304.40–320 in its entirety, the trial court rejected that instruction and instead instructed the jury as follows:

## INSTRUCTION NO. 1–INFORMED CONSENT

With respect to disclosing to Plaintiff, Loretta Sargent, the risks and benefits of the surgical operation he proposed to perform upon her it was the duty of the Defendant, William Shaffer, M.D. to exercise the degree of care and skill expected of a reasonably competent physician specializing in orthopedic spine surgery under similar circumstances.

## INTERROGATORY NO. 1

Do you believe from the evidence that William Shaffer, M.D. failed to comply with the duty set forth in Instruction No. 1?

YES ___ NO ___
(Check One)
[signature lines for jurors]

If your answer is "Yes", please proceed to Interrogatory No. 2.

If your answer is "No", you have found for the Defendant, please proceed to Instruction No. 2.

## INTERROGATORY NO. 2

Do you believe from the evidence that such failure on the part of William Shaffer, M.D. was a substantial factor in causing injuries and damages of which the Plaintiff, Loretta Sargent, complains?

YES ___ NO ___
(Check One)
[signature lines for jurors]

There was no objection at trial and no complaint on appeal by either party as to the necessity and correctness of Interrogatories No. 1 and No. 2. The only question before this Court is whether Instruction No. 1 correctly sets forth the law applicable to informed consent, in light of the

language contained in KRS 304.40–320. Sargent argues that the trial court's instruction on the physician's duty to fully inform the patient was deficient because it did not fully incorporate all of the elements of KRS 304.40–320. Dr. Shaffer argues that the instruction given by the trial court was a correct expression of the applicable law. As explained in the preceding section, an allegation of instructional error of this kind is subject to *de novo* review.

■■■ We begin with a simpler proposition which is not challenged: it is a well-established principle of law that, as an aspect of proper medical practice, physicians have a general duty to disclose to their patients in accordance with accepted medical standards the risks and benefits of the treatment to be performed.[7] We said in *Keel v. St. Elizabeth Medical Center*, 842 S.W.2d 860 (Ky. 1992), that KRS 304.40–320 details the standards for compliance with the duty to inform patients of the risks of medical treatment:

> We note incidentally the suggestion [ ] that St. Elizabeth might not have a duty to inform Keel on the theory that this responsibility lay with his personal physician. Under KRS 304.40–320, the duty is upon "health care providers"; and KRS 304.40–260 expressly includes hospitals within the definition of that term. *We have no doubt that the duty exists and is breached at peril.*

*Id.* at 862. (emphasis added).[8]

■■■ It is equally well-established that the legislature may "as amplification of the 'general duty'," impose specific, or special, duties. *Wemyss v. Coleman*, 729

S.W.2d 174, 180 (Ky. 1987). It is also firmly established that, in addition to the general duty of ordinary professional care, health care providers are subject to special duties created by the legislature, which must be incorporated into jury instructions in medical negligence cases. *Humana of Kentucky, Inc. v. McKee*, 834 S.W.2d 711, 722 (Ky. App. 1992) ("[H]ospitals are required to comply with many statutory duties in addition to that of exercising ordinary care . . . [T]he court obviously is required to instruct the jury regarding that [statutory] duty because the violation of such a duty, standing alone, may be sufficient to support a claim of negligence."). In appropriate situations, "properly drafted [jury] instructions [must] utilize 'specific duties.'" *Henson v. Klein*, 319 S.W.3d 413, 425–26 (Ky. 2010) (quoting *Wemyss*). We therefore proceed with our analysis recognizing that KRS 304.40–320 is an exercise of the legislature's prerogative to amplify, or expound upon, the general duty of a medical provider to obtain a patient's informed consent with specific conditions for compliance. KRS 304.40–320 provides as follows:

> In any action brought for treating, examining, or operating on a claimant wherein the claimant's informed consent is an element, the claimant's informed consent shall be deemed to have been given where:
>
> (1) The action of the health care provider in obtaining the consent of the patient or another person authorized to give consent for the patient was in accordance with the accepted standard of medical or dental practice among mem-

---

7. This principle is, after all, explicitly stated in the trial court's instruction which Dr. Shaffer argues was correct.

8. As Justice Abramson, in her separate opinion, more fully explains, *Keel* is an opinion of a divided court. Nevertheless, six justices (three members of the majority and all three dissenters) acknowledge the point for which we cite the decision: KRS 304.40–320 defines the duty of informed consent.

bers of the profession with similar training and experience; and

(2) A reasonable individual, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedure and medically or dentally acceptable alternative procedures or treatments and substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among other health care providers who perform similar treatments or procedures[.] [9]

The introductory provision of KRS 304.40–320 leaves no doubt that the statute is intended to apply in claims of medical malpractice based upon the element of informed consent. Informed consent, or the lack thereof, plainly is an *element* in this medical malpractice action. KRS 304.40–320(1) clearly embodies the general duty we have long recognized in our tort law. Indeed, Subsection (1) appears to be a codification of our holding in *Holton v. Pfingst*, 534 S.W.2d 786 (Ky. 1975), and it is accurately reflected in the jury instructions used by the trial court in this case. Dr. Shaffer argues that Subsection (2) of KRS 304.40–320 was *not* intended by the legislature to be applied by the courts as part of the standard for measuring compliance with the duty to obtain informed consent. If not a standard for measuring compliance with the duty, what then would the statute do? Where would it apply if *not* in an "action brought for treating, examining, or operating on a claimant wherein the claimant's informed consent is an element?" We will not construe a statute to be inapplicable in the only situation that is expressly mentioned in the statute for its application.

In *Holton*, our predecessor court held that a physician's duty to inform patients of medical risks is the same as the standard duty in medical negligence cases: in disclosing a patient's risks, the doctor must use the degree of care and skill reasonably expected of a reasonably competent physician specializing in that area acting in the same or similar circumstances. KRS 304.40–320, was enacted one year later, obviously to function as an amplification of the general duty by the legislature, a special duty precisely of the type referenced in *McKee, Wemyss*, and *Henson*; and it is not the prerogative of the judiciary to ignore it.

Significant in that legislative expression is the word *"and"* placed between Subsection (1) and Subsection (2). We apply the conjunction, "and," as written by the legislature unless that construction would clearly thwart the intent of the legislature or produce an absurd result. *Robinson v. Commonwealth*, 437 S.W.3d 153, 155 (Ky. App. 2013). We discern no such impediments to its straightforward application in the circumstances presented here. Construed in accordance with its plain terms and obvious meaning, it is readily apparent that, in an applicable civil action where informed consent is an issue, a medical treatment provider has satisfied the duty to obtain the patient's consent only if both provisions are met. Not only must the physician's action in disclosing the risks be "in accordance with the accepted standard of medical ... practice among members of the profession with similar training and experience" as stated in Subsection (1), it is further required that the information imparted by the physician be stated so as to

---

9. Subsection (3) of KRS 304.40–320 has no application in this case, but it provides: "In an emergency situation where consent of the patient cannot reasonably be obtained before providing health care services, there is no requirement that a health care provider obtain a previous consent."

provide "a reasonable individual" with "a general understanding of the procedure ... [any] acceptable alternative[s] ... [the] substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among other health care providers who perform similar treatments or procedures."

Contrasting the requirements of KRS 304.40–320 with the instruction used by the trial court reveals the inadequacy of the latter. By failing to incorporate the "general understanding" component of the duty provided in Subsection (2), the instruction given by the trial court does not accurately set forth the applicable law. We cannot agree with the assertion that an informed consent instruction couched only in terms of the general professional standard of care is close enough.

The jury was required to determine if Sargent's consent to the surgery was sufficiently "informed" so as to invalidate her claim that Dr. Shaffer had not adequately advised her of the risk she faced. To this end, both parties were entitled to have a jury fully informed of the applicable law. On one side, Sargent was entitled to have the jury made aware that Dr. Shaffer was in neglect of his duty unless his warning to Sargent would have provided "a reasonable individual" with "a general understanding" of the "substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among other health care providers who perform similar treatments or procedures." On the other side, Dr. Shaffer was entitled to have the jury made aware that, regardless of whether Sargent personally understood that she faced the risk of paralysis, his warning was adequate if "a reasonable individual" would have "a general understanding" that paralysis was a possible outcome. Without the statutory yardstick provided by KRS 304.40–320(2), the jury did not have the necessary standard by which it was to judge the claim of either party regarding the adequacy of Dr. Shaffer's description of the risks.

In the evidentiary context of the case, the question was whether "a reasonable individual" would generally understand that "nerve injury" included the possibility of permanent paralysis below the waist. Because the jury was not so instructed, we must reverse the judgment and remand for a new trial on that issue.[10]

In opposition to our analysis and conclusions above, Dr. Shaffer reminds us of our traditional "bare bones" approach to jury instructions, "leaving it to counsel to assure in closing arguments that the jury understands what the instructions do and do not mean." *CSX Transp., Inc. v. Begley*, 313 S.W.3d 52, 60 (Ky. 2010). " 'Bare bones' instructions are proper if they correctly advise the jury about 'what it must

---

**10.** We recognize that the language of KRS 304.40–320 stating that informed consent "shall be deemed to have been given" could be construed as standing for the proposition that the legislature meant this statute to set a ceiling, such that informed consent cannot be contested when (1) and (2) are met. The implication of this reading is that a doctor could do less, and still possibly have the patient's "informed consent." However, even that construction does not eliminate the need to incorporate the statutory standard into a jury instruction. There could always be a factual dispute about what language provides "a reasonable individual" with a "general understanding" of the risks, and we can conceive no other meaning in the statute than the intent for such disputes to be resolved, like any other dispute of material fact, by trial. However, the better interpretation, we believe, is that the use of the word "deemed" is necessary in support of the objective standard created in Subsection (2). Meeting the standard does not require that patient's *actual* understanding of the risks; it only requires that the risks be explained so that "a reasonable individual" would gain a general understanding of the risks.

believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof' on that issue." *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 229 (Ky. 2005) (citing *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, .824 (Ky. 1992)). We reaffirm our commitment to the "bare bones" approach.

 However, fundamental to the bare bones approach is that *all of the bones* must be presented to the jury. All essential aspects of the law necessary to decide the case must be integrated into the instructions. Here, they were not. Omitting the "general understanding" element of informed consent set forth in Subsection (2) of the statute does not "correctly advise the jury about 'what it must believe from the evidence in order to return a verdict.'" It is one thing for lawyers to explain in closing arguments "what the instructions do and do not mean[;]" it is quite a different thing to expect lawyers to explain what the law requires, but is omitted from the instructions, "[I]nstructions must not be so bare bones as to be misleading or misstate the law." *Harp v. Commonwealth*, 266 S.W.3d 813, 819 (Ky. 2008). The essence of Subsection (2) is not flesh to be debated by lawyers in the closing arguments; it is one of the structural elements,. the bones, around which the substance of the law of the case is built.

We also reject Dr. Shaffer's .argument that an instruction on Subsection (2) is unnecessary because an instruction covering only Subsection (1) generally captures all of the requirements of Subsection (2). Subsection (1) covers the means employed by the health care provider to obtain the patient's consent. The "action of the health care provider" in obtaining consent must be "in accordance with the accepted standards of [the relevant] medical or dental practice[.]" KRS 304.40–320(1).. Quite differently, Subsection (2) covers the content of "the information provided," and it sets forth the objective standard that "a reasonable individual" must have from that information a "general understanding" of the risks "recognized among health care providers who perform similar treatments[.]" KRS 304.40–320(2). The two subsections perform very different functions and address two different aspects of "informed consent." Instructing upon one does not supply the jury with what it must know about the other.

As part of the foregoing argument, Dr. Shaffer posits that in medical cases we typically instruct only upon the general duty of professional care because jurors not versed in the technical standards of the medical arts must rely on the testimony of medical experts explaining what constitutes compliance with the applicable medical standard of care. That is certainly true in many instances of professional liability cases, whether it is medical, legal, architectural, or some other profession. But, it is true in the typical case *only* because compliance with the applicable professional duty ordinarily involves conduct generally understood only by those trained in the applicable professional field. To the contrary, the "reasonable individual" and "general understanding" standard provided in Subsection (2) of KRS 304.40–320 is perfectly suited for application by jurors of ordinary competence, education, and intellect, save only the need for evidence on whether the "risks and hazards" involved are among those "recognized among other health care providers who perform similar treatments or procedures."

Dr. Shaffer points out that the instruction given by the trial court closely mirrors the model instruction provided for informed consent cases in Palmore & Cetrulo, *Kentucky Instructions to Juries, Civil* § 23.10 (5th ed. 2015). We recognize the

cited treatise as a respected and persuasive authority that is regularly consulted and cited by the bench and bar of this state. Its model instructions, however, do not purport to cover every instance that may arise in litigation. The "Comment" for § 23.10 provided by the author refers only to *Holton v. Pfingst,* the pre-KRS 304.40–320 case cited above, and to *Bennett v. Graves,* 557 S.W.2d 893, (Ky. App. 1977). There is no reference at all to KRS 304.40–320, and the fair assumption is that the author of the treatise has not yet endeavored to address the application of KRS 304.40–320(1) and (2), and is most likely awaiting a definite ruling of this Court.

In this vein, we note that Sargent's tendered instruction provided as follows:

> It was the duty of William Shaffer, M.D. to obtain Loretta Sargent's informed consent before surgery. Informed consent shall be deemed to have been given where (1) the action of Dr. Shaffer in obtaining the consent of the patient was in accordance with the accepted standard of medical practice among members of the profession with similar training and experience; and (2) a reasonable individual, from the information provided by William Shaffer, MD, would have a general understanding of the procedure and medically acceptable alternative procedures or treatments and substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among other, health care providers who perform similar treatments or procedures.

This proposed instruction fairly and accurately captures the general duty to obtain a patient's informed consent, including the elements of KRS 304.40– 320. It is simple and uncluttered by complex or confusing verbiage. With minor variations based upon the peculiarities of the particular case, it would serve well as an appropriate model for similar cases. Of course in the ordinary case, the foregoing "duty" instruction would be followed by interrogatories requiring the jury to determine *if* the defendant failed to comply with the duty, *and if so,* whether the defendant's failure to comply with the duty was a substantial factor in causing damages to the plaintiff, exactly as was done by the trial court in this case without an objection from either party.[11]

▮▮▮ It is also worth noting the value of providing, as the trial court did here, separate and distinct instructions on the surgeon's duty to obtain informed consent and on the surgeon's duty in connection with the performance of the medical treatment provided. While both of Sargent's claims fall under the generic umbrella of medical negligence, a claim that the surgery was conducted without the patient's informed consent differs fundamentally from a claim that the surgery was performed negligently. The two claims involve separate, entirely unrelated factual inquiries directed at separate, unrelated acts occurring at separate, distinct times.

11. Like the trial judge in this case, we cast this model instruction in the interrogatory format with the jury charged to return "special" verdicts in the form of interrogatory answers. Some trial judges may prefer, and we have no aversion to, the narrative format in which a jury is instructed to return a general verdict based upon its findings. For example: "If you believe from the evidence that the defendant failed to comply with the duty set forth in Instruction No.____, and you further believe from the evidence that such failure was a substantial factor in causing the injuries and damages of which the plaintiff complains, then you shall find for the plaintiff. Otherwise, you shall find for the defendant." So long as it captures and fairly expresses the applicable law, either form is acceptable.

Evidence that authorizes an instruction on one claim does not in any way authorize an instruction on the other; and the damages arising from the violation of one duty are not necessarily the same as the damages caused by the other. Moreover, as illustrated by this case, following appellate review, an instructional error that compels a remand and retrial can be limited to the verdict affected by the erroneous instruction when the two distinct claims are presented to the jury in separate instructions.

We have also fully considered Dr. Shaffers' arguments based upon *Rogers v. Kasdan*, 612 S.W.2d 133 (Ky. 1981) and *Hamby v. University of Kentucky Medical Ctr.*, 844 S.W.2d 431 (Ky. App. 1992), and we appreciate the warning that instructions in medical cases should not be burdened with specific duties where the general duty instruction is adequate. *Rogers* and *Hamby*, however, are easily distinguishable from this case.

This case does not involve the exhaustively and minutely detailed lists of "duties" seen in *Hamby* and in *Rogers*.[12] However, as noted above, a simple instruction reflecting all the elements of KRS 304.40–320 would not be burdensome or confusing. Nor would this approach unduly encumber the trial court. Also, it does not risk overemphasizing some elements of the case at the expense of others, which was a chief cause for concern in both *Rogers* and *Hamby*.

The detailed lists of special duties rejected in *Rogers* and *Hamby* were all simply specific means by which the general duty itself may have been violated. That is not true here; failing to comply with Subsection (2) of KRS 304.40–320 is not merely a more specific means of violating Subsection (1). Subsection (2) is a stand-alone provision, setting an objective standard for evaluating whether the information imparted to the patient was understandable. That concept is not captured by an instruction that embodies only Subsection (1), and more specifically, was not captured by the instruction used here by the trial court.

Simply put, the exhaustively detailed instructions disapproved in *Rogers* and *Hamby* are not analogous to the simple, singular, and generalized duty established by the General Assembly in KRS 304.40–320(2). The inclusion of this duty does not infuse the instructions with an overabundance of detail, nor does it give undue prominence to certain facts and issues.

12. The duties specifically listed in the jury instructions at issue in *Rogers* were:

a. Maintain procedures appropriate and adequate to determine whether the nurses and the staff of the hospital were maintaining adequate medical records which would enable the patient to receive effective continuing care as would enable a physician or other practitioner to assume the care of the patient at any time.

b. To provide nurses knowledgeable of the requirements for adequately providing patient care necessary under circumstances like or similar to those in this case.

c. Maintain procedures appropriate and adequate to determine whether the physicians on the staff of the hospital were carrying out their duties in a manner consistent with good medical practices.

d. To maintain procedures appropriate and adequate to determine whether the nurses on the staff were properly monitoring the fluid input and output of the patient under circumstances like or similar to those in this case.

e. To maintain procedures appropriate and adequate to determine whether the nurses on the staff of the hospital were following the rules pertaining to the dispensing of drugs and properly using the Physicians Desk Reference and other manuals available to them.

f. To maintain procedures appropriate and adequate to determine whether the nurses were carrying out their duties in a manner consistent with good medical and hospital care under similar circumstances.

*Rogers*, 612 S.W.2d at 135, 136.

The inclusion of both elements of the duty contained in KRS 304.40–320 is consistent with our tradition of "bare bones" instructions; it would not transform the jury instructions given in this case into the "rigid list" of special duties decried in *Rogers.*

██ Finally, Dr. Shaffer suggests that interpreting KRS 304.40–320(2) as a duty in defining informed consent raises, by implication, a constitutional challenge to KRS 304.40–320, citing Ky. Const. §§ 14, 54, and 241; a challenge that can be averted only by rejecting Sargent's appeal using the principle of constitutional avoidance. Although he does not explicitly mention the jural rights doctrine by name, his invocation of these three constitutional sections suggests concern for that principle unique to Kentucky jurisprudence.

██ The jural rights doctrine holds that the Kentucky legislature may not abrogate a plaintiffs right of recovery under causes of action in existence at the time of the adoption of our present constitution in 1892. *Williams v. Wilson,* 972 S.W.2d 260, 265 (Ky. 1998). What is overlooked in Dr. Shaffer's argument is that KRS 304.40–320(2) in no way restricts a common law cause of action. Consent has always been an element in claims of uninvited touching, a battery, even in the medical context. With *Holton,* and our transition away from the concept of medical battery as an intentional tort to the negligence-based theory of a medical malpractice claim, obtaining the "informed consent" of the patient remains a defense assertable against a claim of negligence in medical "touching" cases, and in no way

burdens the claimant's cause of action. The constitutional provisions underlying the jural rights doctrine are simply not implicated by KRS 304.40–320. Indeed, the legislature has frequently refined the duties associated with common law tort actions without infringing upon jural rights, and we have not challenged its authority to do so.[13]

██ In summary, we hold that the instruction given in this case was erroneous because it failed to incorporate the law applicable to a medical provider's duty to obtain informed consent. Erroneous jury instructions are presumed to be prejudicial; the party defending the erroneous instruction bears the burden of showing that no prejudice resulted. *McKinney v. Heisel,* 947 S.W.2d 32, 35 (Ky. 1997). Comparing the description of the risks as they were actually articulated to Sargent and the nature of the risk involved, we are unable to conclude that Sargent was not prejudiced by the faulty instruction.

██ Dr. Shaffer argues that the omission from the instructions of the "general understanding" aspect of informed consent was harmless because experts on both sides acknowledged the need to explain the risks in a comprehendible way. It is the duty of the trial court, not the witnesses, to instruct the jury on the law. Jurors are generally informed that they may discredit testimony of witnesses; they may not discredit the instructions of the court. It is not likely that the witness testimony was accorded the same dignity jurors ordinarily accord to trial court instructions, which is why correct and com-

---

13. In *Henson v. Klein,* 319 S.W.3d at 426, we encouraged the legislature to clarify an ambiguous statute defining the special duties applicable in common law personal injury cases arising from the operation of boats on navigable waters. ("We highlight this ambiguity in [KRS 235.285(4)] with the respectful suggestion that the General Assembly provide clarification to better inform the boating public and the courts of the specific duties the legislature intended to impose.").

plete instructions are ordinarily essential aspects of a fair trial.

It is certainly possible that reasonable jurors, properly instructed on *all* of the requirements of KRS 304.40–320, might have reached a different verdict on the question of whether Dr. Shaffer obtained the patient's informed consent to proceed with the risky surgery. Accordingly, we reverse the judgment of the Court of Appeals.

Dr. Shaffer argues that our decision should apply only prospectively, on the theory that the trial court's instruction was correct at the time it was given. We disagree. Our decision on this issue cannot come as a surprise. KRS 304.40–320(2) has been on the books since 1976. Moreover, Sargent's trial counsel explicitly cited it to the trial court and proffered an appropriate instruction to illustrate the point. Our decision today does not overrule existing precedent, and it does not upset settled law. There is simply no justification for us to defer the application of a law that is nearly 40 years old.

## IV. CONCLUSION

For the reasons set forth above, we reverse the opinion of the Court of Appeals and remand this matter to the Fayette Circuit Court for further proceedings consistent with this opinion.

All sitting. Minton, C.J., Barber, Cunningham, and Noble, JJ., concur. Abramson, J., concurs in result only by separate opinion. Keller, J., dissents by separate opinion.

ABRAMSON, J., CONCURRING IN RESULT ONLY:

I respectfully concur in result only.

This is a case of first impression. Although KRS 304.40–320 was adopted in March 1976 and became effective in July of that year, this Court has never had occasion to address what effect, if any, the statute has on jury instructions. Nevertheless, this Court's occasional treatment of the informed consent statute in other contexts has given rise to considerable confusion over the years as to the statute's import, and has resulted in the current reality where the leading treatise, 2 Palmore & Cetrulo, *Kentucky Instructions to Juries, Civil,* provides an instruction essentially identical to the one the trial judge gave in this case, an instruction now deemed wrong. While today's Opinion may not come as a total surprise to the bench and bar, in the sense of being entirely unexpected, it does represent a break with current litigation practice, and under those circumstances I find it important to explain my analysis.

This Court has cited KRS 304.40–320 seven times in the last forty years, beginning with *Keel v. St. Elizabeth Medical Ctr.,* 842 S.W.2d 860 (1992), the case which most likely led to the confusion in this area. While *Keel* deserves a close look, initially it is only necessary to note that it was not a jury verdict case but rather an appeal from a summary judgment in favor of a hospital. The trial court and Court of Appeals held, properly in my view, that an informed consent claim could not proceed to the jury in the absence of expert testimony regarding the standard of practice within the medical profession. As discussed more fully below, this Court reversed in a plurality opinion and sent the case back to the trial court for further proceedings, citing the statute but ignoring its import.

The next encounter with the statute was a glancing one in a footnote by Justice Leibson writing in dissent in *Lewis v. Kenady,* 894 S.W.2d 619 (1994). That case was an appeal from a jury verdict but the question presented was whether the trial

court erred in not allowing the defendant-physicians to withdraw admissions made when they failed to respond to some requests for admissions that went to the heart of the informed consent claim. The majority never mentioned the statute and the dissent simply observed: "Nothing in KRS 304.40–320, which attempts to codify the common law as to when informed consent has been given and obtained, remotely suggests a different result." 894 S.W.2d at 623 n. 1. In context, the dissent was simply saying that the statute did not change the common law requirement that a physician cannot perform a surgery without informed consent.

Three years later, in *Kovacs v. Freeman*, 957 S.W.2d 251, 253 (Ky. 1997), the statute was cited again. The majority identified the issue in that case as "the extent of authority granted by a hospital consent form to a surgeon who was not listed on the form." After much discussion of whether an informed consent form could be a contract between the physician and patient, the unanimous court concluded that informed consent "is a process, not a document." *Id.* at 254. As for the statute, the Court stated: "There is no. statutory or regulatory requirement in Kentucky that a consent to surgery be in written form. The Kentucky statute dealing with legal requirements for valid informed consent to medical treatment, KRS 304.40–320, makes no reference to a written consent document. Instead, evidence of a valid consent, per Kentucky law, lies in the verbal discussion between physician and patient." *Id.* at 255. The Court then quoted the statute, highlighting language such as "action of the health care provider in obtaining the consent of the patient,"

which supported its position that a written document was unnecessary.

Next, in *Vitale v. Henchey*, 24 S.W.3d 651 (Ky. 2000), the Court addressed a case in which the surgeon who operated on an elderly patient was not the surgeon to whom the patient's son, acting under a medical power of attorney, had given consent. There was apparently no breach of the standard of care in the performance of the surgery but there was the issue of the "wrong"·surgeon. This Court noted that *Holton v. Pfingst*, 534 S.W.2d 786 (Ky. 1975) and the later-enacted informed consent statute addressed negligence claims where "the risks and hazards" involved in a proposed treatment or procedure were allegedly not disclosed to the patient. 24 S.W.3d at 655. To that point, the statute was quoted in its entirety with emphasis on the "substantial risks and hazards" language in KRS 304.40–320(2). The *Vitale* majority concluded that where there was *no* consent for a particular surgeon to perform a procedure the action was not a negligence claim but rather one for the intentional tort of battery. *Id.* at 656.

In *Larkin v. Pfizer*, 153 S.W.3d 758, 769 (Ky. 2004), while answering a certified question from the United States Court of Appeals for the Sixth Circuit, this Court observed: "[t]he learned intermediary rule is consistent with our informed consent statute, KRS 304.40–320, which anticipates that doctors will inform their patients of any risks or dangers inherent in proposed treatment." The *Larkin* opinion then quotes a portion of the statute, which, of course, does not literally say "any" risks but rather "substantial risks and hazards . . . ." 153 S.W.3d at 769–70.

Finally and most recently,[14] in *Fraser v. Miller*, 427 S.W.3d 182 (Ky. 2014), this

---

14. It is unnecessary to address a seventh case, *Solinger v. Pearson*, 2010 WL 1006072 (Ky. 2010), because the statute was merely mentioned when the Court referenced the plaintiff's complaint. The Court reversed summary judgment as prematurely granted.

Court held that a plaintiff had not properly preserved the trial court's alleged error in disallowing presentation of an informed consent claim to the jury. The majority noted that the physician had unsuccessfully moved for summary judgment pre-trial on the grounds that prescribing a therapeutic drug did not fall within the purview of KRS 304.40–320 but, later at trial, had successfully obtained a directed verdict on that same ground and also due to a failure of proof, *i.e.*, failure to offer expert testimony that the physician deviated from the standard of care. 427 S.W.3d at 185. We held that the plaintiffs counsel waived appellate review by not responding to the directed verdict, not objecting to the failure to give an informed consent instruction, and otherwise failing to preserve the issue. Concurring in result only, two justices found the issue preserved but concluded there was no error because the absence of expert testimony was fatal to the plaintiffs case under the informed consent statute. They noted that *Keel's* holding to the contrary (that an informed consent case can survive without expert testimony) has been criticized by federal courts and read very narrowly by our own Court of Appeals. *Id.* at 188.

This criticism of *Keel* brings one full circle to the source of the confusion. In that case, a plaintiff developed thrombophlebitis at the site of the injection he received prior to a CT scan. The hospital gave him no information concerning risks associated with a CT scan although it did ask if he had had previous scans. The trial court dismissed his informed consent claim due to a lack of expert testimony regarding the professional standard, and the Court of Appeals affirmed. 842 S.W.2d at 860. Three justices subscribed to an opinion that first discussed *Holton v. Pfingst, supra,* a 1975 case that approved a directed verdict on informed consent "for

want of expert testimony," and then addressed KRS 304.40–320, which also required expert testimony regarding "the accepted standard of medical ... practice." 842 S.W.2d at 861. Although the statute plainly required the testimony (*Holton v. Pfingst* had dodged the issue) those justices concluded that expert testimony was not required in all instances including Keel's case where no information was given prior to the procedure. They cited common law negligence cases where "the failure is so apparent that laymen may easily recognize it or infer it from evidence within the realm of common knowledge." *Id.* at 862. So while the three justices acknowledged the statute, they also ignored its plain language. Concurring in result only, Justice Leibson was unrestrained in his criticism of what he perceived to be an unconstitutional statute:

> KRS 304.40–320 should have no bearing whatever on this case because it is a plainly unconstitutional legislative intrusion into liability for common law wrongs (negligence and assault and battery) protected from such intrusion by our Kentucky Constitution, Secs. 14, 54 and 241. Constitutionally, the statute cannot define the duty.
>
> Our Opinion should not give aid and comfort to an unconstitutional statute by deigning to discuss its application.

*Id.* at 863. Notably, the three dissenters roundly rejected the idea that an informed consent case could be presented to a jury without expert testimony. "KRS 304.40–320 in effect states the two elements for a *prima facie* informed consent case." *Id.* at 865. As they understood the law,

> In sum, KRS 304.40–320 mandates that the plaintiff satisfy two requirements in an informed consent case. First, the plaintiff must prove that the disclosure made by the health care provider did not satisfy the accepted stan-

dard of the members of that profession with similar training and experience. Second, plaintiff must prove that a reasonable individual would not understand the procedures, acceptable alternatives, and the substantial risks inherent in the proposed treatment from the health care provider's disclosures.

*Id.* The lengthy dissent discussed the passage of the statute; its drafter, the Governor's Hospital and Physicians Professional Liability Insurance Advisory Committee ("Committee"); and the commentary on the informed consent provision in a 1975 Committee report to the Governor. In essence the dissenters said, "the legislature has spoken and this is what an informed consent claim is."

Confusion in the post-*Keel* years is fully understandable. If the statute set the prima facie elements of the claim as the dissenters insisted, it would seem logically to follow that that was how a jury should be instructed, but the justices espousing that position were in the minority. And while the three "majority" justices certainly cited and quoted KRS 304.40–320 they absolutely ignored it in reaching their holding, grafting a common law *res ipsa loquitur* theory on to the statute and/ or simply applying common law negligence principles. To add to the confusion, Justice Leibson, whose concurring in result only vote was necessary to produce the resulting reversal, vehemently rejected the statute as unconstitutional. Not surprisingly with that fractured plurality opinion, no one knew quite what to do with KRS 304.40–320. To the extent an informed consent claim was addressed separately from general medical negligence, the common practice became to instruct, as the *Kentucky Instructions to Juries* volume still reflects, only on whether the physician "follow[ed] acceptable medical standards," a practice that focused on "what the physician knew or should have known at the

time he recommended the treatment to the patient." *Holton v. Pfingst,* 534 S.W.2d at 786.

Today the effect of KRS 304.40–320 on an informed consent claim, and more particularly on the jury instructions for such a claim, is squarely presented. To state the obvious, this Court is not free to ignore a statute passed by our General Assembly but must construe it. *Ally Cat, LLC v. Chauvin,* 274 S.W.3d 451, 455 (Ky. 2009) (Words in statute "mean something" and "we are not free to ignore" them.).

In construing statutes, our goal, of course, is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration. We presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes. We also presume that the General Assembly did not intend an absurd statute or an unconstitutional one. Only if the statute is ambiguous or otherwise frustrates a plain reading, do we resort to extrinsic aids such as the statute's legislative history; the canons of construction; or, especially in the case of model or uniform statutes, interpretations by other courts.

*Shawnee Telecom Resources, Inc. v. Brown,* 354 S.W.3d 542, 551 (Ky. 2011) (internal citations omitted).

Looking at the language the General Assembly chose, in an action against a health care provider "wherein the claimant's informed consent is an element," the statute provides when that informed consent "shall be deemed to have been given ..." This language is undeniably awkward

but it also' unquestionably states that the informed consent obligation (which has been long recognized at common law) has been satisfied where (1) the action by the provider is "in accordance with the accepted standard of medical or dental practice among members of the profession with similar training and experience" and (2) the information the patient received would give "a reasonable individual" a "general understanding of the procedure and medically or dentally acceptable alternative procedures or treatments and substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among health care providers who perform similar treatments or procedures." KRS 304.40–320. Because the statute is not couched in terms of duty ("It shall be the duty of any health care provider in obtaining informed consent to ...."), Dr. Shaffer suggests that it is not a legislative declaration of duty but rather of a presumption, a presumption to be applied by the court in deciding whether a jury question exists. Given the language of the statute this position appears to have some merit but, on closer examination, it simply does not work.

Dr. Shaffer cites *Mason v. Commonwealth*, 565 S.W.2d 140 (Ky. 1978), a criminal case in which the trial court gave an insanity defense instruction which ended with a statement that "the law presumes every man sane until the contrary is shown by the evidence." This Court affirmed the conviction but instructed the trial courts to delete that language from the instructions in the future. "Presumptions are in the nature of guides to be followed by the trial judge in determining whether there is sufficient evidence to warrant the submission of an issue to the jury, and should not be included in the instruction." *Id.* at 141. The Court cited

McCormick's Handbook of the Law of Evidence § 345 (2nd ed. 1972) for the proposition that the effect of a presumption is to shift the burden of producing evidence with respect to a presumed fact so that if that evidence is actually produced by the adversary, the presumption disappears. "The trial judge need only determine that the evidence introduced in rebuttal is sufficient to support a finding contrary to the presumed fact." 565 S.W.2d at 141, citing McCormick's at p. 821. In the context of *Mason*, once the trial judge determined that there was sufficient evidence regarding the defendant's mental state to justify instructing the jury on an insanity defense, there was no need to tell the jury about what the law generally presumes. Stated differently, where there is evidence to create a jury question regarding the insanity defense the presumption of sanity is gone, or as McCormick states it is "spent and disappears." *Id. See also* Lawson, The Kentucky Evidence Law Handbook §§ 10.05—.10 (5th ed. 2013) discussing civil statutory and common law presumptions.

Applying presumption law (and logic) to KRS 304.40–320 reveals the problem with limiting its application to the domain of the trial judge. Once discovery is completed, there are three possible scenarios. In the first scenario, as here, there will be competing expert testimony regarding whether "the action of the health care provider" was in accordance "with the accepted standard of medical ... practice" and thus the "presumption" disappears and the case goes to the jury. In the second scenario, if the plaintiff has *no* expert testimony that the defendant failed to meet the standard of care, the first part of the "presumption" test applies (it is presumed the defendant acted in accordance with the applicable standards)[15] and, if KRS

---

**15.** *Keel* is to the contrary but, in my view, was wrongly decided. See also *Fraser v. Miller,*

304.40–320 truly is a presumption, the second part regarding "a reasonable individual" understanding the substantial risks and hazards would have to be applied by the trial judge. Finally in a third possible scenario, if the plaintiff has expert testimony and the defendant has no evidence to the contrary, the first part of the "presumption" cannot apply because the only evidence of record is that the defendant has failed to meet the accepted standard. In that event, there is no issue to be tried and the plaintiff would be entitled to summary judgment or a directed verdict, as appropriate.

The difficulty with construing KRS 304.40–320 as a presumption is that it would result in the trial court applying different "law" to the informed consent issue than the jury applies if given the currently prevailing instruction. It is difficult to see that as anything but an absurd result, which under our rules of statutory construction we are compelled to avoid.[16] *Shawnee Telecom*, 354 S.W.3d at 551.

As Dr. Shaffer notes, KRS 304.40–320 was part of a tort-reform effort and was produced by the Governor's Hospitals and Physicians Professional Liability Insurance Advisory Committee in 1975. In the Committee's Majority Report they describe the statute, (Section 13 of their proposal and eventually Section 4 of Senate Bill 248 in the 1976 Session of the General Assembly), as follows:

> This section will legislatively require that "informed consent" cases be proven by expert testimony relating to accepted standards of practice of the profession in providing information, and further require that an objective standard be applied in determining whether that information would likely have resulted in any different decision by the plaintiff. The purpose of this section is to eliminate the possibility of (1) a jury's speculating after the fact that the health care provider should have told the plaintiff of a given risk even though accepted professional standards would not require such advance information, and (2) a plaintiff's testifying that had he known of an unforseeable or unlikely injury he would not have consented to the recommended health care.

As detailed in J. Vaughan Curtis, *Informed Consent in Kentucky After the Medical Malpractice Insurance and Claims Act of 1976*, 65 Ky. L.J. 524, 530 (1976), contemporaneous with the law's passage there were two different standards by which courts around the country measured the adequacy of disclosures to patients, the medical community standard and the material risk standard. The medical community standard is self-evident. Representative of the latter standard, is *Canterbury v. Spence*, 464 F.2d 772, 787 (D.C. Cir. 1972), wherein the court held "the test for determining whether a particular peril must be divulged is its materiality to the patient's decision." This material risk standard, the minority position, meant that expert testimony was generally not required and lay testimony would suffice.

427 S.W.3d at 186 (J. Keller concurring, joined by J. Noble).

16. A recent Court of Appeals case, *Horsley v. Smith*, —— S.W.3d ——, 2015 WL 602813, *8 (Ky. App. 2015), suggests "Far from creating a statutory duty, [the statute] implies the existence of a safe harbor for the health care provider who is able to establish the existence of the circumstances described in the statute." A safe harbor, like a presumption, is applied by the Court. If the conditions are met, the defendant has no liability. Inevitably, the safe harbor approach leads to the same quandary created by construing the statute as a presumption, the incongruity of a trial judge applying different (and more detailed) law than the jury.

65 Ky. L.J. at 532–33. The Committee, and ultimately the legislature, firmly aligned Kentucky with the medical community standard in subsection (1), but in what can be accurately deemed "a policy compromise," *id.* at 536, between that standard and the material risk standard also included subsection (2) of the statute, a subsection that looks at the disclosure from the "reasonable individual" standpoint. Indisputably, KRS 304.40–320 arose from an effort to address a "health care malpractice crisis," Committee Majority Report at 1, but the language the legislature gave us is the language we must apply and, inartfully drafted as it may be, it lends itself to the logical conclusion that this is the Kentucky law relevant to informed consent. Looking back at the Committee's Majority Report, they appear to have believed as much, going so far as to emphasize the "objective standard", the "reasonable individual" test in subsection (2), by stating the law would prevent "a plaintiffs testifying that had he known" of a risk he would not have consented. Moreover, while KRS 304.40–320 concededly does not contain clear "duty" language, *Horsley,* —— S.W.3d at —— –——, 2015 WL 602813 **8–9, it must mean something and to construe it as a presumption or a safe harbor (the only alternative explanations that have been offered) leads to a disconnect, a disparity in the law being applied to the evidence by the trial judge *vis-à-vis* the jury. As discussed above, that is an absurd result that must be avoided.

Finally, given Justice Leibson's dissent in *Keel* quoted above, the issue of conflict, if any, between KRS 304.40–320 and the jural rights doctrine has found its way into this case as well. In *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.,* 286 S.W.3d 790, 797–801 (Ky. 2009), the jural rights doctrine was discussed and applied by Justice Scott writing for the Court, joined by Justice Venters. The remaining members of the Court concurred in result only with three members of the Court expressing the belief that the jural rights doctrine is "unsupportable." 286 S.W.3d at 816. In the majority opinion in this case, Justice Venters finds the General Assembly's action in adopting the informed consent statute consistent with the jural rights doctrine. So regardless of whether one subscribes to the doctrine or not, it seems apparent that no member of this Court finds a jural rights issue with the General Assembly's passage of KRS 304.40–320.

In closing, the course charted today is admittedly different from current practice, but after thorough consideration I am convinced that it is the course that was intended by our General Assembly in 1976. A jury should be given the law applicable to the case and for that reason I concur in the result of the majority opinion.

## KELLER, J. DISSENTING:

The majority cites to *Wemyss v. Coleman,* 729 S.W.2d 174 (Ky. 1987), *Humana of Kentucky, Inc. v. McKee,* 834 S.W.2d 711 (Ky. Ct. App. 1992), and *Henson v. Klein,* 319 S.W.3d 413, 425 (Ky. 2010) for the proposition that jury instructions should contain statutorily imposed duties. I agree; however, those cases are distinguishable.

In *Wemyss,* the issue was whether the instructions in a motor vehicle accident case should include the duty to wear a seatbelt. The Court held that, because there was no statutory duty to wear a seatbelt, such an instruction was not appropriate. 729 S.W.2d at 180–81. In *McKee,* the Court of Appeals held that giving an instruction regarding the failure to test for PKU in an infant was appropriate because KRS 214.155 specifically required hospitals to administer that test.

834 S.W.2d at 722. In *Henson*, a case involving a collision between two personal watercrafts, the primary issue before the Court was how the general duty of care, the statutory duty of care to "operate a motorboat or personal watercraft on public waters according to the 'Rules of the Road,'" and the sudden emergency doctrine interact. The Court determined that an instruction incorporating a statutory duty, even a duty as amorphous as operating according to the "Rules of the Road," was appropriate. *Id.* at 425.

All three cases have a common theme— if there is a statutory duty and the evidence supports a violation of that duty, then instruction regarding the duty may be appropriate. The majority contends that KRS 304.40–320 creates a statutory duty to "inform patients of medical risks" and, if the evidence supports it, the jury must be instructed on all of the elements contained in the statute. In support of this contention, the majority states that KRS 304.40–320 was enacted as "an amplification of the general duty" to "inform patients of medical risks" recognized by our predecessor Court in *Holton v. Pfingst*, 534 S.W.2d 786 (Ky. 1975). I disagree with this statutory interpretation.

In *Holton*, the Court noted how other jurisdictions address the issue of informed consent.

> Some courts categorically require the patient to produce expert testimony as to what disclosure of risks or hazards should be made. Other courts hold that experts are unnecessary and that lay witness testimony can establish a submissible case of failure to disclose a risk or hazard of treatment which a physician knew or should have known. Other courts have ordinarily required expert evidence by the plaintiff on the issue of the extent of disclosure required except in those instances where the court deter-

mined that the necessity of disclosure of the risk involved was 'too clear to require expert medical testimony.' Some of the text discussions although unsupported by decided cases have advocated a shift of burden approach whereby if the patient produces evidence of a failure to disclose a particular risk or hazard, then the burden shifts to the physician to excuse the failure by proof of professional standards which would seek to establish disclosure was either not required or was regarded as not in the best interest of the patient under the peculiar fact situation.

*Id.* at 788–89 (citations omitted). After outlining the preceding, the Court found that there was "no evidence, lay or expert, that [the physician] failed to disclose that which he knew or should have known." *Id.* at 789. Therefore, the *Holton* Court did not state how courts in the Commonwealth should address the issue of informed consent.

The majority infers from the timing of the passage of KRS 304.40–320 that the legislature was imposing an amplified duty on physicians regarding what they must do in order to obtain informed consent. However, because *Holton* did not clarify how courts were to treat the issue of informed consent, and arguably muddied the waters, it is as likely, if not more likely, that the legislature was not imposing a duty on physicians but rather clarifying how the concept of informed consent fits within the standard of care applicable in nearly every medical negligence case.

KRS 304.40–320 provides as follows:

In any action brought for treating, examining, or operating on a claimant wherein the claimant's informed consent is an element, the claimant's informed consent shall be deemed to have been given where:

(1) The action of the health care provider in obtaining the consent of the patient or another person authorized to give consent for the patient was in accordance with the accepted standard of medical or dental practice among members of the profession with similar training and experience; and

(2) A reasonable individual, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedure and medically or dentally acceptable alternative procedures or treatments and substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among other health care providers who perform similar treatments or procedures;

(3) In an emergency situation where consent of the patient cannot reasonably be obtained before providing health care services, there is no requirement that a health care provider obtain a previous consent.

The introductory language of the statute is not language that creates a freestanding statutory duty. Unlike the statutes in *McKee* and *Henson*, KRS 304.40–320 does not require hospitals, physicians, or other health care providers to do anything, let alone obtain informed consent. It simply states that, if informed consent is an element of a claim, health care providers who comply with the statutory provisions shall be deemed to have obtained informed consent. Thus, the better interpretation of the statute is that it creates a presumption that, if a hospital, physician, or other health care provider complies with its provisions, informed consent was obtained and liability will not attach.

I find further support for the interpretation that KRS 304.40–320 creates a presumption rather than a duty in this Court's interpretation of KRS 186.640 in *Rentsch-*ler v. Lewis, 33 S.W.3d 518, 518 (Ky. 2000). KRS 186.640 provides that:

Any driver involved in any accident resulting in any damage whatever to person or to property who is ineligible to procure an operator's license, or being eligible therefor has failed to procure a license, or whose license has been canceled, suspended or revoked prior to the time of the accident, *shall be deemed* prima facie negligent in causing or contributing to cause the accident.

(Emphasis added.) This Court stated that KRS 186.640 created a rebuttable presumption of liability and, if a defendant overcame that presumption by showing he was not at fault, liability would not attach. *Rentschler* at 520. Similarly, the *shall be deemed* language in KRS 340.40–320 creates a rebuttable presumption of non-liability; it does not create a duty.

In *Wemyss*, this Court held that, absent a statutory duty, expansion of jury instructions beyond the general standard of care is inappropriate. Section (1) of KRS 304.40–320 sets forth the general standard of care, and I agree with the majority that it provides appropriate language for an instruction when informed consent is an issue and there is evidence to support the giving of the instruction. *See Oghia v. Hollan*, 363 S.W.3d 30 (Ky. Ct. App. 2012). However, none of the sections of KRS 304.40–320 create or impose any duty to obtain informed consent. As the Court held in *Wemyss* "where there is no statutory duty, a proper instruction ... will state the general duty to exercise ordinary care ... leaving it to the jury to decide from the evidence whether the" failure to exercise that care was a substantial factor contributing to the plaintiffs injuries. *Id.* at 181. In this case, there is no statutory duty to obtain informed consent, and the trial court was only required to give a

general instruction on the standard of care with regard to informed consent.

We have held on a number of occasions that "[i]t is 'never proper to instruct the jury as to presumptions of law or of fact.'" *Rentschler*, 33 S.W.3d at 520, *citing* J. Palmore, *Kentucky Instructions to Juries (Civil)* § 13.11g, at 16 (4th ed. Anderson 1989); *see also Meyers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814, 824 (Ky. 1992). The majority's holding that the language in KRS 304.40–320(2) is mandated in cases involving informed consent does just that.

Finally, I note that the legislature passed KRS 304.40–320 in 1976. We have not, in the past thirty-nine years, interpreted this statute as imposing the expanded duty the majority now finds. I am not convinced by the majority's opinion that we should impose that expanded duty, particularly when there is no clear statutory mandate to do so. As stated above, and as I stated in *Oghia*, when the **evidence** dictates, the trial court shall issue two separate duty-of-care jury instructions; however, the trial court should not be required to include the non-existent duty the majority finds in KRS 304.40–320(2).

For the foregoing reasons, I would affirm the Court of Appeals.