RENDERED: AUGUST 20, 2020
TO BE PUBLISHED

$\mathfrak{Supreme\ Court\ of\ Kentucky}$ FINAL

2019-SC-000473-MR

DATE 9/10/20
*a. hutcherson*

RICKY ALLEN BOWEN                                      APPELLANT


V.
ON APPEAL FROM MASON CIRCUIT COURT
HON. STOCKTON B. WOOD, JUDGE
NO. 19-CR-00009


COMMONWEALTH OF KENTUCKY                               APPELLEE


**OPINION OF THE COURT BY JUSTICE KELLER**

**AFFIRMING**

A Mason County jury found Ricky Allen Bowen guilty of attempted murder and theft by unlawful taking of a firearm. The trial court, consistent with the jury's recommendation, sentenced Bowen to twenty years of imprisonment on the attempted murder charge and five years of imprisonment on the theft by unlawful taking charge, to run concurrently for a total sentence of twenty years. This appeal followed as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record and the arguments of the parties, we hereby affirm the judgment of the Mason Circuit Court.

**I.    BACKGROUND**

In December 2018, Bowen lived with his partner, Rebecca Greene, in a farmhouse that they rented. On December 7, 2018, an argument erupted

between Bowen and Greene. The couple went to bed around 10:00 PM that evening. Greene ultimately slept on the couch in the living room, still upset from the argument.

Bowen testified that he woke the following morning still thinking about the argument. He testified that he wanted to "end it all" and wanted the couple to "be together forever," so he decided to kill Greene and himself. He then walked to a barn located about 500 feet behind the farmhouse. The barn was owned by the couple's landlord, Larry Darnell. From the barn, Bowen retrieved a loaded .22 caliber revolver, which also belonged to Darnell. Unbeknownst to Bowen, the gun was loaded with two shells of "rat shot" or "snake shot." This type of ammunition is typically used for pest control and consists of small pellets that spread out when the gun is fired.

Bowen took the gun back into the rental home. He then took an approximately one-hour nap. Upon waking up, he prayed and walked into the living room, where Greene remained asleep on the couch. Bowen then shot Greene in the head with the revolver. According to his own testimony, he wanted to kill her.

Greene testified that she was sleeping when she heard something and felt pain. She touched her head and realized it was bleeding. She saw Bowen standing over her, and she asked him what he had done. He did not respond. She jumped up from the couch, ran to the kitchen, and retrieved a dishcloth to hold against her head. Bowen testified that when Greene jumped up from the

2

couch, he realized he no longer wanted to kill her. He testified that he laid the gun down and tried to help Greene.

At this point, Greene checked on her son, who was asleep in another room. She also asked Bowen to call 911, but he told her his phone was not working. Greene then called 911 on her own phone. Bowen testified that he helped relay information to the dispatcher. Bowen waited with Greene until law enforcement arrived. Greene testified that, during this time, Bowen tried to get Greene and her son into his car, but she refused. Bowen testified that he wanted to take her to the hospital.

When police arrived, Bowen claimed that he accidentally shot Greene. At an officer's request, he led the officer to the gun, at which point he admitted that he had intended to kill Greene. He was arrested. Meanwhile, Greene received medical treatment. She survived with a wound to her forehead and small metallic particles embedded in the soft tissue of her forehead.

After a one-day trial, a jury found Bowen guilty of one count of attempted murder and one count of theft by unlawful taking of a firearm. He was sentenced to a total of twenty years of imprisonment. This appeal followed.

## II.    ANALYSIS

On appeal, Bowen argues that the trial court erred by (1) declining his request for a renunciation jury instruction and (2) denying his motion for directed verdict on the charge of theft by unlawful taking of a firearm. We address each argument in turn.

3

## A. The trial court did not err in declining Bowen's request for a renunciation instruction.

On appeal, Bowen argues that the trial court should have granted his request for a renunciation, or abandonment, instruction, an issue which he properly preserved. We review the trial court's refusal to give a specific jury instruction for an abuse of discretion. *Sargent v. Schaffer*, 467 S.W.3d 198, 204 (Ky. 2015). "[A] trial court abuses its discretion when its decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 203 (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)). In considering whether the trial court abused its discretion in refusing to give a jury instruction, we are mindful that a trial court is under no obligation to instruct the jury on a theory that is unsupported by the evidence. *Thompkins v. Commonwealth*, 54 S.W.3d 147, 151 (Ky. 2001) (citing *Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky. 1998)). When considering whether the theory was supported by the evidence, we "must consider the evidence in the light most favorable to" the requesting party. *Thomas v. Commonwealth*, 170 S.W.3d 343, 347 (Ky. 2005) (citing *Ruehl v. Houchin*, 387 S.W.2d 597, 599 (Ky. 1965)).

In the present case, Bowen requested a renunciation, or abandonment, instruction on the attempted murder charge. Under Kentucky Revised Statute ("KRS") 506.020, a defendant charged with attempt to commit a crime may present a defense that "under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, the defendant abandoned his

4

effort to commit the crime and, if mere abandonment was insufficient to avoid the commission of the crime, took the necessary affirmative steps to prevent its commission." KRS 506.020(1).

Bowen argues that he was entitled to a renunciation instruction because he took affirmative steps to help Greene after shooting her. For example, he tried to call 911 with his own phone, but it did not work. When Greene called 911 with her phone, Bowen did not try to stop her, but instead helped relay information to dispatch. He then waited with her until police arrived. Throughout that time, he did not threaten Greene, nor did he attempt to flee the scene. Based on these circumstances, Bowen argues that he was entitled to a renunciation instruction.

We disagree. We recently addressed a similar argument in *Ball v. Commonwealth*, 2018-SC-000244-MR, 2019 WL 4739251 (Ky. Sept. 26, 2019). In that case, Ball and his co-defendant robbed a convenience store. *Id.* at *1. During the robbery, Ball approached a man sweeping at the back of the store and shot him in the neck. *Id.* Ball and his accomplice eventually ran from the store, at which point the store owner called 911. *Id.* The shooting victim survived. Ball was convicted of attempted murder. *Id.*

On appeal, Ball argued that the trial court erred in declining his request for a renunciation instruction. *Id.* He specifically argued that he was entitled to such an instruction because he presented evidence that he left the store after shooting the victim, took no additional steps to ensure that the victim died, and thereby allowed the victim to receive life-saving medical treatment. *Id.* at

5

*10. We explained, however, that there was no evidence that Ball "made any efforts to abandon his commission of the crime or took any steps to avoid its commission *prior* to the shooting." *Id.* In other words, "[l]eaving the store *after* the crime does not constitute abandonment, as the crime—the shooting of [the victim]—had already taken place." *Id.*

We reach a similar conclusion in this case. While Bowen testified that he wanted to help Greene, assisted her in calling 911, and stayed with her until law enforcement arrived, there is no evidence that he "made any efforts to abandon his commission of the crime or took any steps to avoid its commission *prior* to the shooting." *Id.* Instead, the evidence indicates that he retrieved the gun from the barn, brought it into the home, took a nap, and then shot Greene in the head, with the intent to kill her. It was not until after she jumped up from the couch, still alive, that he decided he no longer wanted to kill Greene. His attempts to help her receive medical treatment do not constitute abandonment, "as the crime—the shooting of [the victim]—had already taken place." *Id.*

Thus, even considering the evidence in the light most favorable to Bowen, there is no evidence that, "under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, [Bowen] abandoned his effort to commit the crime and, if mere abandonment was insufficient to avoid the commission of the crime, took the necessary affirmative steps to prevent its commission," as required by KRS 506.020(1). Rather, he completed the act of shooting Greene, but failed to kill her as he had intended. Accordingly, we hold

6

that the trial court did not abuse its discretion in declining to give a renunciation instruction.

## B. The trial court did not err in denying Bowen's motion for directed verdict on the theft by unlawful taking charge.

Bowen argues that the trial court erred in denying his motion for a directed verdict on the theft by unlawful taking charge. In front of that court, he argued that the Commonwealth failed to present sufficient evidence of an intent to deprive Darnell of the gun, and it had similarly failed to prove that the gun would not have been returned to Darnell if Bowen had completed the murder-suicide. The trial court denied both Bowen's initial motion for a directed verdict made at the close of the Commonwealth's case as well as his renewed motion for a directed verdict made at the close of all of the evidence.

In reviewing a trial court's denial of a motion for directed verdict, we are mindful of the following:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). Thus, "there must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Id.* at 187-88 (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983)). In other words, so long as the Commonwealth

7

produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied. When we review the trial court's decision to deny a motion for directed verdict, we must consider whether, "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt" because "only then the defendant is entitled to a directed verdict of acquittal." *Id.* at 187.

Thus, in this case, we must determine whether, under the evidence as a whole, it would have been clearly unreasonable for a jury to find Bowen guilty of theft by unlawful taking of a firearm. Under KRS 514.030,

> a person is guilty of theft by unlawful taking or disposition when he unlawfully
>
> (a) Takes or exercises control over movable property of another with intent to deprive him thereof; or
>
> (b) Obtains immovable property of another or any interest therein with intent to benefit himself or another not entitled thereto.

Theft by unlawful taking is classified as a Class A misdemeanor, except in certain circumstances listed in KRS 514.030(2). Relevant to this case, under KRS 514.030(2)(a), theft by unlawful taking is a Class D felony when the property is a firearm, regardless of the value of the firearm.

To this Court, Bowen reiterates his argument that there was insufficient evidence to prove that he intended to deprive Larry Darnell of the gun. He points to the definition of "deprive" found in KRS 514.010(1):

> (a) To withhold property of another permanently or for so extended a period as to appropriate a major portion of its economic value or with intent to restore only upon payment of reward or other compensation; or

8

(b) To dispose of the property so as to make it unlikely that the owner will recover it.

Thus, there are four definitions of "deprive":

1) to withhold property of another permanently; 2) to withhold property for so extended a period as to appropriate a major portion of its economic value; 3) to withhold property with intent to restore it only upon payment of reward or other compensation; or 4) to dispose of the property so as to make it unlikely that the owner will recover it.

*Hall v. Commonwealth*, 551 S.W.3d 7, 12 (Ky. 2018) (citations omitted).

Bowen argues that there was no evidence to prove an intent to deprive under any of these four definitions. Rather, he argues, the evidence indicated that he intended to use the gun to kill Greene and then himself. If he had done so, he argues, he would not have permanently deprived Darnell of the gun, nor would he have been withholding the gun for economic value or for reward or compensation or disposing of the gun so as to make it unlikely that Darnell would recover it. Instead, Bowen contends that Darnell would have been able to simply recover the gun if Bowen's murder-suicide plan had succeeded.

For support, Bowen cites to *Hall v. Commonwealth.* In that case, Hall was stopped by police but managed to flee the scene in a police cruiser. *Id.* at 11. The officers pursued Hall, but eventually lost sight of him. *Id.* Soon after, they located the cruiser abandoned on a dirt road. *Id.* Hall was apprehended a few days later and charged with theft by unlawful taking. *Id.* At trial, Hall moved for a directed verdict on this charge, arguing that no proof existed of his intent to deprive. *Id.* The trial court denied the motion, and Hall was ultimately convicted of theft by unlawful taking, among other things. *Id.*

9

We reversed this conviction, holding that the trial court had erred in denying Hall's motion for a directed verdict on the charge of theft by unlawful taking. In doing so, we examined each of the four definitions of "deprive." *Id.* at 12. The second and third definitions did not apply; there was no evidence that Hall sought economic gain or compensation. *Id.* The fourth definition—to dispose of the property so as to make it unlikely that the owner will recover it— also did not apply, as Hall took a police cruiser, not a civilian vehicle, and knew the police were close behind him when he abandoned the car. *Id.* at 13. Thus, we held, no reasonable jury could say that Hall intended to dispose of the cruiser so as to make it unlikely that the police would ever find it. *Id.*

Lastly, we took a closer look at the first definition of "deprive": to withhold the property of another permanently. *Id.* We explained that the intent to withhold the property of another permanently means "that the defendant intends that the property never be restored to its rightful owner, where intent can be inferred from the facts and circumstances." *Id.* (citation omitted). Thus, "[a] defendant does not need to maintain actual possession over the taken [property] at all times after taking the property—a defendant can possess the *intent to withhold property of another permanently* if evidence exists showing that the defendant intended that the rightful owner never exert actual possession over the property again." *Id.* Turning to Hall's case, we noted that "[n]o rational person would think that an individual who uses a police cruiser as a getaway car and who abandons that police cruiser in the middle of the road, knowing that police are following close behind, intends that the police

10

[c]ruiser never again be restored to the police." *Id.* at 14. We therefore held that the trial court had erred in denying Hall's motion for a directed verdict on that charge. *Id.* at 15.

We believe *Hall* to be distinguishable. When apprehended by police, Hall took a marked police cruiser, led the police on a high-speed chase, and quickly abandoned the vehicle in the middle of the road after approximately thirty minutes, knowing that police were close behind. We therefore held that Hall "was simply trying to evade the police." *Id.* at 14. In contrast, Bowen took the gun from the barn for the stated purpose of killing Greene and himself. He now argues that Darnell could simply have retrieved the gun after their deaths, but this ignores the fact that Bowen admitted his intent to use the gun as a murder weapon. Had Bowen carried out his plan, there would be no abandonment or return of the property by Bowen; rather, he would have been dead, leaving the gun behind as a key piece of evidence that may have been confiscated by police. Furthermore, a reasonable jury could believe that Bowen, who had been arguing with Greene the evening before, intended to kill only Greene and not himself. A reasonable jury could believe that, under those circumstances, he had never planned to return the murder weapon to its rightful owner. We therefore conclude that, under the evidence as a whole, a reasonable jury could infer that Bowen intended to permanently deprive Darnell of the gun.

Accordingly, we hold that the trial court did not err in denying Bowen's motion for directed verdict on the charge of unlawful taking of a firearm.

11

## III. CONCLUSION

For the reasons set forth above, we hereby affirm the judgment of the Mason Circuit Court.

All sitting. Hughes, Keller, Lambert, Nickell and Wright, JJ., concur. Minton, C.J., concurs in part and dissents in part by separate opinion in which VanMeter, J., joins.

MINTON, C.J., CONCURRING IN PART AND DISSENTING IN PART: Chief Justice Minton would affirm the attempted murder conviction but would reverse the theft by unlawful taking conviction because the record contains no evidence that Bowen intended to deprive Darnell of the gun.

VanMeter, J., joins.

COUNSEL FOR APPELLANT:

Brandon Neil Jewell
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Matthew Robert Krygiel
Assistant Attorney General